UNITED STATES, Appellee

v

DUNCAN W. PENMAN, Corporal, U. S. Marine Corps, Appellant

16 USCMA 67, 36 CMR 223

No. 18,843
March 4, 1966

*Lieutenant John P. Meade,* USNR, argued the cause for Appellant, Accused.

*Lieutenant Colonel Daniel F. McConnell,* USMC, argued the cause for Appellee, United States.

## Opinion of the Court

KILDAY, Judge:

In his appeal from a conviction by general court-martial for wrongful possession of marihuana, the accused reiterates the contentions advanced on his behalf at trial; namely, that the search of his personal belongings, which disclosed his possession of the marihuana, was illegal since it (1) was authorized by a person not empowered to do so and (2) was based on an insufficient showing of probable cause, and that his subsequent confession was the fruit of this poisoned tree.

At the outset we pause to note that we are again faced with the difficult task of determining the existence of probable cause to search by reviewing the sometimes hazy recollections of the persons involved, as reflected by their testimony at trial, rather than having available for review, as in civilian practice, the affidavits filed with the magistrate in connection therewith. As we stated in United States v Hartsook, 15 USCMA 291, 294, 35 CMR 263:

"Where an affidavit, establishing the grounds for issuing a warrant, has been sworn to before the proper authority, and is available for review, no problem exists as to the basis for the latter's determination that probable cause existed. Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960). But where, as in the military, authorization generally is granted on a mere verbal presentation, the issue must necessarily be determined through the taking of extensive testimony. This is often a difficult method of procedure for in most cases trial is held some period of time later and all concerned must rely on their memories to recall just what information was supplied and received. On occasion, the data and testimony available is not sufficient for a proper determination and on appeal we have had to return the case for a rehearing on this issue. United States v Davenport, . . . [14 USCMA 152, 33 CMR 364]."

It is quite apparent that if the civilian practice were followed the problem would be considerably minimized not only on appellate review but more importantly at time of trial where the issue is initially raised. The absence of such documentation places a tremendous burden on all the parties and not inconceivably could result in an unjust adjudication of the matter. We very strongly recommend that the civilian practice be adopted throughout the military.

### I

Turning first to the issue of whether the search was authorized by a person empowered to do so, we find a definite disagreement between appellate counsel with the defense alleging that the search was authorized by the battalion adjutant and the Government countering with its contention that the authorization was given by the executive officer, to whom the power to so act had been delegated by the commanding officer. If the defense is correct, the search was illegal for the adjutant was not among those to whom this authority was delegated, as evidenced by the commanding officer's testimony at trial and by the copy of his directive entered as a prosecution exhibit.[1] We express no opinion and need not now decide whether the adjutant could properly have been included therein, for, the plain fact of

---

[1] Specifically the commanding officer's authority was delegated to "a. The Battalion Executive Officer or, in his absence, b. The Battalion Duty Officer."

**69**

the matter is that he was not included and hence did not have authority to order the search. However, as we stated in United States v Drew, 15 USCMA 449, 453, 35 CMR 421:

". . . the commanding officer's power of delegation is not an absolute and unreasoning one, but is to be exercised reasonably and impartially."

While Judge Ferguson dissented in *Drew* and his views on the delegation of authority to search are set forth therein, he accepts that decision as governing the situation here presented.

Whether the executive officer, Major Stcherbinine, authorized the search must be gleaned from his testimony at trial. We quote from it at length because of its relevance not only to this issue but to the question of probable cause as well. After identifying himself and his position and pointing to the accused as one recognized by him, the following pertinent colloquy took place:

"Q. Do you recall the events of 5 November 1964 regarding Corporal Penman?

"A. Yes, sir, I do. It was several months ago. I couldn't tell you exactly.

⁎　⁎　⁎　⁎　⁎

"Q. On the 5th day of November 1964, do you recall a conversation regarding a request to search Corporal Penman?

"A. Yes, sir. I was sitting in my office. It is adjacent to the Adjutant's office.

⁎　⁎　⁎　⁎　⁎

"Q. O. K.

"A. And I overheard a conversation between several Marines and the Adjutant that the State Police had raided an apartment or house where there was a marihuana party, where this was going on. I started to leave my office and go into the adjacent one. There were two Marines there, at which time I didn't know who they were. Later I found out they were members of the Provost Marshal's force. The Adjutant, the Sergeant-Major and Mr.

Flanagan, our Battalion Legal Officer—and I believe he was the Officer of the Day at that time—and this conversation kept going on that, well, they raided this apartment, that Penman there had left fifteen minutes or a half hour before they raided them and that they suspected that he had marihuana in his possession.

"Q. Was there any mention of any arrest being made down there? That you recall?

"A. I am not sure whether they arrested those people that they raided at the apartment or not; that I don't remember.

"Q. You just don't remember at this time?

"A. That's right. And I spoke to Lieutenant Flanagan, I don't remember, pertaining to this and he said to me, 'I am going down to the Barracks, to either shake down or search this man by the name of Penman,' and the best that I can remember, either I said 'O. K.' or 'All right,' or something like that, and that's about all I can say.

⁎　⁎　⁎　⁎　⁎

"Q. Could you be mistaken as to whether or not you talked to Mr. Flanagan or not?

"A. No, I could not be mistaken because I talked to him and exactly remember what he said. He said, 'I am going down and shake this man down. I am going to search this man—I am going to the Barracks and I'm going to search this man for marihuana,' and I said, 'Go ahead,' or 'All right.'

"Q. Did you have any conversation with Warrant Officer Willis?

"A. Well, I believe I probably talked to him. I couldn't state exactly what I said to him because two Marines were talking at the same time with him, and I was standing in the middle taking all this in. All I can say is this: That I knew that the State Police or whatever organization it was raided some apartment. There was a party going on at this place that had marihuana.

I also know that they suspected Penman of having it in his possession. I know that Mr. Flanagan was going down there to search him and I said 'All right.' The only thing else that I can add on to this, is that later on, Mr. Flanagan briefed me and showed me a weed that is supposed to have been marihuana. Since I don't know anything about marihuana to know one weed from another, I couldn't tell you the difference, which I understand later on was substantiated by the Bureau of Narcotics to be marihuana. He also stated that Penman was cooperative and he assisted the two Marines from the Provost Marshal and produced this weed. And that's all I can state.

"Q. Do you recall whether the information that you think was given you by Lieutenant Flanagan might have also been given to you by Warrant Officer Willis?

"A. I realize how serious this is and I'm trying to do my best. This happened over two and a half months ago. As I stated before, I don't remember exactly whether Mr. Flanagan gave it to me, or I heard part of it as I was coming out of my office and was in the office while the two Marines were talking to the Adjutant, Mr. Willis. I can't exactly state exactly who gave it to me. All I can state is that I knew that what had happened, as I said once before, that the State Police were raiding an apartment, that there was supposed to have been a marihuana party, that Penman left fifteen or thirty minutes before that, and that they wanted to search him for it, and I said, 'All right,' and that's all I can say.

. . . . .

"Q. Sir, you are familiar with Battalion Order 5800.1, Staging Battalion; is that correct?

"A. Yes, I am.

"Q. I'll show it to you. It's been marked Prosecution Exhibit 1. Therein it states that you do have authority to authorize a search?

"A. Yes, I do, in the absence of the Commanding Officer, which at that time he was not in his office.

"Q. To the best of your recollection you authorized this search?

"A. Yes, sir, I did. If I didn't want him to go down there, I would have said, 'No, you can't go.'

"TC: I don't have any further questions.

"CROSS-EXAMINATION

"Questions by the defense:

"Q. Sir, did you testify that you came out of the office and spoke to Lieutenant Flanagan?

"A. Yes, I did.

. . . . .

"Q. Did Lieutenant Flanagan tell you, at this time when you spoke to him, did he tell you that there had been a marihuana party the previous evening? At a San Diego location?

"A. No, I believe that I heard that part of it while I was sitting in the office, and part of it while it was being discussed by the two Marines and the Adjutant.

"Q. Did you hear, or overhear that the Police had raided a—made a roundup in San Diego area—what I am trying to get at, Major, the knowledge that you heard, the facts that you heard—whether you overheard them or whether you heard them from Lieutenant Flanagan. I am trying to determine what facts you heard.

"A. I heard that from the conversation from the time I was sitting in my office to the time that I came out, and I talked to Flanagan, and I probably talked to the Adjutant.

"Q. Well—

"A. While they were all talking I could hear and understand the subject, things that were taking place. Now, I don't know if you're familiar with Staging Battalion, but we get people from the entire United States. Every crime possible, except treason, has been committed while I have been there, and I wouldn't have authorized a search of any kind had I not known that

something had happened, because I know that you don't just go around authorizing searches because somebody wants to search somebody.

"Q. The thing I am trying to get at is what facts you heard in this particular incident, referring to this particular affair—what facts you heard which would lead you to believe—lead you to think that the search was in order.

"A. Well, I wouldn't have gave [sic] the authority to have the search in the first place if I didn't have any facts.

"Q. Yes, I realize that, sir. I realize that, but I want to know what facts you did hear before you—

"A. I will repeat what I said before: I heard that the State Police —they didn't round anybody up— but I heard that they raided an apartment and this, in this apartment there was supposed to have been a marihuana party going on, and that Penman was supposed to have left fifteen or thirty minutes prior to the raid, and that he was suspected of having marihuana in his possession.

"Q. You were not aware at the time, I believe you said, that the two strangers in the office were CIS Agents, you weren't aware at this time?

"A. I assumed it, but to be aware of it, I would have had to ask them to break out their credentials, I would have to examine them, and for me to state that I knew they were members of the Provost Marshal's —which I didn't do that—I assumed they had something to do with it. I knew they were passing through the area and wanted to search Penman, so therefore, I assumed that they were connected in some way; but I didn't ask for identification, I didn't talk to them, I didn't question them.

"Q. You did not talk to the CIS Agents?

"A. I don't remember talking to them. I think I was—if I talked to anyone it probably would have been the Adjutant and I was listening to what was happening.

"Q. You don't remember asking the Adjutant any questions?
"A. No, 1 don't.

"Q. Do you remember the Adjutant telling you anything, speaking directly to you? I think you stated that you overheard a pretty good part of this.
"A. I could have been facing— as I say, this was two and a half months ago. I cannot state something that I am not sure of, to say that I was facing him and that he said this to me, because it would be a lie, and I don't expect to sit here and say something that I am not sure of.

• • • • •

"Q. Do you recall the two enlisted people, the two strangers—do you recall them coming into your office at any time?
"A. They did not come into my office.

"DC: I don't think I have any further questions at this time, sir.

"REDIRECT EXAMINATION

"Questions by the prosecution:

"Q. Do you recall, sir, in this request for search that was being made, who they wanted to search?
"A. Yes, they wanted to search Penman.

"Q. Did they want to search anything else?
"A. They wanted to search his belongings to see if he had marihuana in his possession since they felt that if he was at this party and he left, he probably had something on him, some sort of narcotics; and that's all that I know.

"Q. Are you able to recall the date that this occurred? Are you able to recall that it was the 5th of November for any particular reason, or do you know, was it the early part of November?
"A. Well, about the only help I can give you was the draft left on the 6th or the 7th, and that happened pretty close because if it did

not, he'd be on that draft; he wouldn't be in this court.

. . . . .

"Q. Did you know what the organization he was assigned to was doing that particular day?

"A. No. They have two Replacement Companies where each one—at some times we have which is equivalent to 1,200 people or more, and there's numerous units and it would be impossible for me to know what Penman was doing or anybody else. He could have been loading his baggage; he could have been getting shots; he could have been out getting inspected by the Optometrist.

"Q. You have no doubt in your mind that when these people left your office, that they were going to search Penman and his effects?

"A. That is right. They were going down to his Barracks.

"Q. This was done with your full authorization?

"A. This is correct.

"TC: I have no further questions.

"DC: No further questions."

The situation depicted here is ludicrous, one of utter confusion and uncertainty, and hardly commendable when consideration is given to the fact that a serious constitutional protection was involved. The only redeeming feature of this scenario is that it might serve as an example of how *not* to perform a judicial function.

Despite our dim view of this procedure, we must conclude the search was authorized by the executive officer for he explicitly so testified in reply to a direct inquiry by trial counsel. He also expressed his awareness of the fact that "you don't just go around authorizing searches because somebody wants to search somebody" and further testified that "I wouldn't have gave [sic] the authority to have the search in the first place if I didn't have any facts." How "informed" his authorization was is another matter.

## II

Every search, whether authorized or not, is not a valid search. See Nathanson v United States, 209 US 41, 78 L ed 159, 54 S Ct 11 (1933), and the cases collated therein at page 46. See also United States v Hartsook, supra. But, as the Supreme Court stated in Aguilar v Texas, 378 US 108, 111, 12 L ed 2d 723, 84 S Ct 1509 (1964), quoting from Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960):

". . . when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present. . . .' "

Hearsay is no bar to a valid authorization (Jones v United States and Aguilar v Texas, both supra) but:

". . . the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v United States, 376 US 528, 11 L ed 2d 887, 84 S Ct 825, was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' Giordenello v United States, supra, 357 US at 486, 2 L ed 2d at 1509; Johnson v United States, supra, 333 US at 14, 92 L ed at 440, or, as in this case, by an unidentified informant." [*Ibid.*, at 114.]

In both *Jones* and *Aguilar* the sup-

porting affidavits upon which the warrants to search were issued were based on hearsay information. A reading of these affidavits (see *Aguilar,* 12 L ed 2d at 725 and footnote 5 at 728) makes it clear why the issuance of the warrant was sustained in *Jones* and held invalid in *Aguilar.* Our case is somewhere in between and is perhaps more akin to the situation presented in Giordenello v United States, 357 US 480, 2 L ed 2d 1503, 78 S Ct 1245 (1958).

In *Giordenello,* a Federal narcotics agent obtained an arrest warrant[2] from a United States Commissioner in Houston, Texas, based on his sworn affidavit that the named accused, on a specified date in the pertinent locality, "'did receive, conceal, etc., narcotic drugs, to-wit: heroin hydrochloride with knowledge of unlawful importation; in violation of . . . .'" He further averred that certain named individuals were material witnesses to the offense. On his arrest the following day, Giordenello was found in possession of a bag which proved to contain a mixture of heroin and other substances. Although warned of his privilege to remain silent, Giordenello promptly admitted purchasing the heroin in Chicago and transporting it to Houston. At a hearing on the motion to suppress the evidence, it appeared that the narcotics agent's information was derived solely from law enforcement officers and other persons in Houston, none of whom appeared before the commissioner or submitted affidavits. In holding the warrant invalid, the Supreme Court did so on the grounds that the affidavit contained no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; did not indicate any sources for the complainant's belief; and did not set forth any other sufficient basis upon which a finding of probable cause could be made.

In the case at bar, a "warrant" to search was issued by the executive officer for that is the effect of his authorization. United States v Hartsook, supra. The details in the "affidavit" are encompassed in his testimony as to the information he gleaned from the discussion in the adjutant's office. While this is a tenuous method of determining the basis for his approval, and certainly vividly portrays the need for some form of affidavit, it is the only method available to us at this level. And, as stated in Jones v United States, supra, at page 267, "The question raised is whether sufficient evidence to establish probable cause to search was put before the Commissioner by the officer, Didone who applied for the warrant."

In essence the executive officer testified that he heard the state police had raided an apartment or a house in which a marihuana party had been staged; that accused had left the location a short time before; and that they (presumably the state police) suspected he had marihuana in his possession. He did not speak with the military investigators but overheard their conversation. He conversed only with the battalion legal officer and perhaps the adjutant, although he didn't recall asking the latter any questions.

Unquestionably, the information related in the presence of the executive officer was hearsay (compounded three or more times as will be noted below), but that is not a sufficient ground for its disqualification as the probable cause for a warrant to issue, "so long as a substantial basis for crediting the hearsay is presented." Jones v United States, supra, at page 269. Insofar as his testimony, standing alone, reflects, Major Stcherbinine received *no* basis, much less a substantial one, for crediting the belief that this accused probably was in possession of marihuana. Penman was suspected of *possession* of marihuana and all Major Stcherbin-

---

[2] The fact that this was a warrant to arrest and not to search makes no difference to our consideration as the Fourth Amendment applies equally to both as stated in Giordenello v United States, 357 US 480, 2 L ed 2d 1503, 78 S Ct 1245 (1958), citing Ex parte Burford, 3 Cranch 448 (U. S. 1806); McGrain v Daugherty, 273 US 135, 154–157, 71 L ed 580, 584–586, 47 S Ct 319, 50 ALR 1 (1927) (*Ibid.,* at page 486).

ine learned was that according to the state police the accused attended a marihuana party just prior to a raid and might have some in his possession. This is the mere belief or suspicion denounced in Nathanson v United States, supra, as not enough.

We will not, however, confine ourselves to the data supplied to the executive officer for a resolution of the matter. While the civilian courts generally confine themselves to consideration of the warrant and the accompanying affidavit, in the absence of such documents we have gone farther and considered the record as a whole. United States v Davenport, 14 USCMA 152, 33 CMR 364.

The record reflects that the initial and *only* information concerning the alleged offense was telephonically supplied to military authorities by a state narcotics agent, Charles J. McLaughlin. His testimony was incorporated by way of stipulation which, in pertinent part, reflects the following:

"Starting at 0500 hours of 5 November 1964 a raid, which was to arrest suspected narcotics users and possessors, took place in the Mission Bay area and throughout the County of San Diego. We had warrants for the arrest of two persons who were living at 717 Venice Court, Mission Beach, California.

"Based upon the fact that we had made an arrest and had discovered marijuana in the possession of the persons at this address, I phoned the CIS Section at Camp Pendleton, California on the morning of 5 November 1964 around 1130. I asked for Sergeant Lewis.

"Sergeant Lewis had worked in our office as a liaison earlier on narcotics investigations. . . . However, Sergeant Lewis was not in and I offered the following information to Sergeant Hagins:

"I explained to Sergeant Hagins that I was with the California State Bureau of Narcotics. I told him that we had arrested numerous persons for use and possession of marijuana. I related to him the informa-

tion that Duncan W. Penman had been at a party at 717 Venice Court, Mission Beach, California prior to the raid and that based on information developed from persons arrested, the party was given in Penman's honor since he was going overseas. I told Sergeant Hagins that if Penman were located, he would probably be in possession of marijuana."

Following receipt of this telephone call, Sergeant Hagins informed Sergeant Buglio, an investigator, of what he had learned and directed him to contact Penman's commanding officer. Sergeant Buglio and a Sergeant Robertson proceeded to the accused's command where they related this same information to the adjutant. It was their conversation which was overheard by the executive officer and formed the basis for the search. If probable cause to search existed, it must be found in the information supplied to Hagins by McLaughlin and reiterated in the presence of the executive officer by Buglio, for the latter testified that what he learned from Hagins was the totality of the information he possessed and upon which he based his request to search. Hagins' testimony was in accord with the stipulation. In addition he averred that he did not know the accused and that McLaughlin did not tell him Penman had been in possession of marihuana on the previous evening but only that he (McLaughlin) suspected that Penman might be in possession of marijuana. Lieutenant Flanagan's[3] testimony added nothing to the overall picture. He recalled being requested by the adjutant to accompany the two sergeants on a search for " 'dope' or something," and he consented. En route he inquired as to what the search was all about "and they explained what they were looking for, and how they had come to learn about this being aboard the Base in our Battalion. I might have asked them what they were searching for. I don't recall exactly."

We agree with the dissenting board

___

[3] Battalion duty officer on the date in question.

of review member that "this search was ordered on the mere ■■ suspicion of a narcotics agent that the accused might possibly be possessed of marihuana." The stipulated testimony of McLaughlin does not contain an affirmative allegation that he spoke with personal knowledge of the information contained therein; it does not indicate any source for his belief; and it does not set forth a sufficient basis upon which a finding of probable cause could be made. Giordenello v United States and Aguilar v Texas, both supra. For all that is known, McLaughlin may not have been one of the arresting officers at 717 Venice Court, for the raids were conducted in the Mission Bay area and throughout the County of San Diego, or have spoken with the people found therein. Assuming, however, that he was there and that the persons arrested personally informed him as to Penman's earlier presence and the reason for the party, *he does not offer any indication that they also told him the accused possessed or used marihuana at the party or that he had some with him when he departed. Furthermore, and of even more importance, is the fact that no indication is given as to the reliability of these unknown sources of information now or in the past.* Aguilar v Texas, supra. See also Wong Sun v United States, 371 US 471, 9 L ed 2d 441, 83 S Ct 407 (1963), and compare Draper v United States, 358 US 307, 3 L ed 2d 327, 79 S Ct 329 (1959). See also United States v Davenport, supra, at page 157.

We cannot leave this issue without giving consideration to the Government's final contention that the search was justified by reason of necessity and no authorization was needed. The accused was in a staging battalion and he was scheduled to depart on the following evening. The Government avers that while he still retained a locker which contained personal property, his seabag was en route for loading aboard ship as hold baggage. The record reflects that when Penman was located he was outside his building and had his seabag with him.

When directed to proceed to his squadbay, he brought his seabag along. Marihuana was found in both the seabag and the locker.

It is well established that a search conducted under circumstances demanding immediate action ■■ to prevent the removal or disposal of property believed on reasonable grounds to be criminal goods is valid. Paragraph 152, Manual for Courts-Martial, United States, 1951; Carroll v United States, 267 US 132, 69 L ed 543, 45 S Ct 280 (1925), 39 ALR 790; United States v Harman, 12 USCMA 180, 30 CMR 180; United States v Swanson, 3 USCMA 671, 14 CMR 89. But necessity does not obviate the requirement of probable cause for a search. Carroll v United States and Wong Sun v United States, both supra; Henry v United States, 361 US 98, 4 L ed 2d 134, 80 S Ct 168 (1959); United States v Brown, 10 USCMA 482, 28 CMR 48. And a search unlawful at its inception may not be validated by what is found. Byars v United States, 273 US 28, 71 L ed 520, 47 S Ct 248 (1927); United States v Di Re, 332 US 581, 92 L ed 210, 68 S Ct 222 (1948); United States v Brown, supra.

We hold, therefore, that this search was founded on mere suspicion and was illegal and the fruits thereof inadmissible.

### III

With reference to the admissibility of the accused's confession, the Government advances no argument, its position being that since it believed the search to be legal reply to this assignment was deemed unnecessary. On the other hand, appellate defense counsel maintained that "the statement was made as a direct result of the illegal search, and comes within the 'poison tree' doctrine," citing Wong Sun v United States, supra.

In his statement, the accused merely acknowledges that he was found with marihuana in his possession by two Criminal Investigations Section investigators; he intended it for his own use, primarily as an aid to medita-

tion and study; and that no other persons in his unit were involved. Further, that while he was willing to cooperate in any way regarding his own situation, he did not wish to make any statements regarding civilians who may have been involved.

The statement is merely declaratory of that which was already illegally known; only the intended ■ use was newly discovered. It followed by less than two hours the search and location of the marihuana. Whether we follow the rule in Nardone v United States, 308 US 338, 341, 84 L ed 307, 60 S Ct 266 (1939), that the challenged evidence must be "so attenuated as to dissipate the taint," or that expressed in United States v Smith, 13 USCMA 105, 109, 32 CMR 105, that "'An accused cannot legally be convicted upon his uncorroborated confession or admission,'" is unimportant to the result in this case. Following the search, the accused was properly warned under Article 31, Uniform Code of Military Justice, 10 USC § 831. Whether this intervening warning dissipated the taint is a matter of judgment, but since the confession followed so closely in time the illegal search it would seem that it was the direct result of exploitation by the Government of its illegal action. Wong Sun v United States, supra. In any event, if the confession be not tainted, it stands uncorroborated as the only evidence of guilt and as such is insufficient to sustain a conviction. United States v Smith, supra. See also Giordenello v United States, supra.

Holding as we do that the search was illegal, its fruit inadmissible, and that accused's confession even if untainted is insufficient as a matter of law to support his conviction, we must set the conviction aside and order the charges dismissed. Article 67(e), Uniform Code of Military Justice, 10 USC § 867.

Accordingly, the decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Navy. The charges are ordered dismissed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

I concur in the conclusion that Major Stcherbinine authorized the search. The remaining question is whether he acted on probable cause. As to that, the majority maintain he acted on information he merely "overheard." I do not interpret his testimony in that light.

Major Stcherbinine testified he went into the adjutant's office. He listened to all that was said; as he put it, he took "all this in." He may not have subjected the informants to cross-examination, but the law does not require such inquiry. The circumstances demonstrate that what took place in the adjutant's office was not just a casual or informal conversation. On the contrary, the evidence establishes that a formal report was tendered to a high official of the accused's command. The presence and participation of the Officer of the Day added to the formality of the proceedings. It is apparent that the Major regarded the situation as calling for his official action; and, as the majority concede, he exercised the powers of his own office to authorize the search. As indicated in the principal opinion, these were the facts upon which he based his authority:

1. The report was made by persons whom he understood were members of the Provost Marshal's office.

2. They informed him that state authorities had raided a marihuana party.

3. The accused was not only present at the party, but was one of the principal figures.

4. The accused left the premises only fifteen to thirty minutes before the raid.

5. At least two persons arrested in the raid were found in possession of marihuana.

This is adequate evidence upon which to predicate a conclusion that

the accused was probably implicated in possession of the contraband.

I would affirm the decision of the board of review.