UNITED STATES, Appellee

v

SHEDRICK A. JETER, Private, U. S. Marine Corps, Appellant

21 USCMA 208, 44 CMR 262

No. 24,296

March 3, 1972

*Lieutenant David A. Monaco*, JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Captain R. O. Kellam*, JAGC, USN.

*Captain John P. Proctor*, USMCR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.*, JAGC, USN.

## Opinion of the Court

QUINN, Judge:

Several issues are presented by this appeal. The principal one is the accused's contention that the authorization to search obtained from his company commander, Lieutenant Parker, was illegal because not predicated upon probable cause.

An authorization to search is valid only if the issuing official has knowledge of "facts that would ▮▮▮▮ lead a prudent person to conclude" that evidence of a crime is probably at the place, or on the person, to be searched. United States v McFarland, 19 USCMA 356,

359, 41 CMR 356 (1970); United States v Elwood, 19 USCMA 376, 41 CMR 376 (1970). Before considering the sufficiency of the facts to establish probable cause, we are confronted with the preliminary. question of determining what facts were known to the company commander. The application for authority to search was not in writing. As at trial, defense counsel contend that the applicant did not relate. all the information he had to the issuing officer, and that the facts actually known to the commander did not establish probable cause for the search. See United States v Hartsook, 15 USCMA 291, 35 CMR 263 (1965); United States v Penman, 16 USCMA 67, 36 CMR 223 (1966); United States v Clifford, 19 USCMA 391, 41 CMR 391 (1970). Government counsel concede that the testimony of the commander as to the information he received does not match the testimony of the applicant as to precisely what he told the commander, but they contend that the details in the testimony of the applicant fill the gaps left by omissions in the testimony of the commander. The difficulty with this argument is that the situation is not just asserted communication of fact by one and silence by the other; there is direct and apparent conflict between the two. Regrettably, in overruling the defense objection, the trial judge did not indicate whether, or how, he resolved those conflicts. First, therefore, we must sort out "only those facts which the record unmistakably indicates were told to the . . . [company] commander." United States v McFarland, supra, page 358; United States v Sparks, 21 USCMA 134, 44 CMR 188 (1971).

July 15th was payday. The next morning, about 8:00 a.m., when Lance Corporal Minderlen of the Third Platoon left his squad bay to report for his regular duty assignment, he inadvertently did not snap shut the lock on the handle of his locker door. At that time he had $76.00 in a potato chip can on the shelf of the locker. About 8:15 a.m., pursuant to the direction of Lieutenant Stokes, the Third Platoon

Commander, and in accordance with company policy for safeguarding the possessions of the company personnel, Corporal Davis went through the platoon squad bay. While he was there, he saw the accused, who was also a member of the platoon, "by his rack," which was about five racks from Minderlen's wall locker. Davis observed no one else. He checked the lockers and found only one that was "open about two inches"; that was Minderlen's. Davis examined the interior of the locker. He saw a cassette stereo tape deck and a tape cartridge; he also looked at the locker shelf but "didn't see anything."

Following the procedure of the company policy as to unlocked lockers, Davis removed the stereo and cartridge and brought them to the platoon office. Under the procedure, property so taken could be recovered by the owner on the performance of extra police duty. Minderlen was notified that his locker had been found open. About 11:00 or 11.30 a.m., he returned to his locker to check what had been taken. He found missing not only the cassette and cartridge, but the can containing the $76.00. Minderlen then reported to Lieutenant Stokes. When he advised Stokes that his money was also missing, Stokes indicated that Davis had not reported to him the "taking [of] any money." To be certain the money was missing and not misplaced, Stokes and Minderlen went to the squad bay to check "all of . . . [Minderlen's] possessions." Neither the can nor the money was found. Thereupon, Stokes personally investigated the loss.

Among other things, Stokes talked to Corporal Davis, who confirmed that he had not taken any money from the locker; he conferred with the police sergeant for the barracks, who advised him that a working party had been in the area of the squad bay; and he talked to the members of the working party, from whom he learned that only one, Dixon, had been in the squad bay. None of these persons had observed anyone in the squad bay except the accused and

Dixon. Stokes also checked the roster of platoon personnel to determine those on guard, mess duty, or in the sick bay. He then went to Lieutenant Parker to request authority to search accused and Dixon and their respective effects.

At trial, Stokes testified as to the details of his investigation. He also testified that he had "informed Lieutenant PARKER of the circumstances that morning," which were "essentially the same thing[s]" he had related "here." Parker also testified. Unfortunately, he was not asked specifically about each of the matters mentioned by Stokes. Their testimony differs in several material respects. Among the most significant differences are the following: Parker testified that Stokes did not "mention" Corporal Davis to him; that Stokes did not "mention a working party"; and that he did not "recall" whether Stokes had indicated to him "that he was relying on anybody else's statements." For purposes of this appeal, we assume, without deciding, that in case of conflict between the applicant and the officer authorizing a search, the testimony of the latter is to be preferred over that of the applicant. See United States v Sparks, supra. Consequently, we put aside those details which Stokes testified he related to Parker but which are inconsistent with Parker's testimony.

Parker knew the money was in Minderlen's locker when he left the squad bay for the regular training duty and that Minderlen discovered the money was missing when he returned at the end of the morning training. Stokes testified that apart from "a working party," whose function was to clean the barracks, and the person sent to check the squad bay lockers to see that they were secure, as provided by the policy "the company commander had set up," there "should be no one in the squad-bay" after the company had started its schedule for the day. As company commander, Parker presumably knew of this limitation on entry into the squad bay. Parker testified he knew the accused was not engaged with the other company personnel in regular duty because he was at the battalion commander's office for "Office Hours." Since Parker's testimony manifests nothing inconsistent with Stokes' on this point, it may be inferred he also knew, as Stokes testified he had told Parker, that Stokes had checked the personnel roster after Minderlen's complaint of the theft and had ascertained that Dixon was the only other person in the platoon not working on the tanks who could have gone into the squad bay during the crucial period. Parker acknowledged he had been informed by Stokes that Stokes "knew that JETER and DIXON had been in the squad bay." (Emphasis supplied.) Parker was not asked, and he did not indicate, whether he understood Stokes to mean that Stokes had personally seen Dixon and the accused in the squad bay or whether he had learned of their presence from other sources.[1] If Parker considered the information as based upon personal knowledge, it was sufficient, in content and reliability, to provide probable cause to believe the accused had been in the squad bay. On the other hand, if Parker considered the report as based upon information obtained from other sources, he still had good reason to credit it without identification of the sources or recitation of the underlying circumstances, since it confirmed his own information as to the accused's probable whereabouts and movements.

Parker knew the accused had not accompanied the other personnel to the

---

[1] Parker testified that he wanted to be "sure" there was "real good cause" to search. Consequently, he "elaborated on it with" Stokes. It is difficult to avoid the conclusion that Stokes thereupon informed Parker, as he testified he did, of the details of the investigation he had conducted, which would unquestionably establish the accused's presence in the squad bay. However, we are constrained to disregard the implications of this part of Parker's testimony, which are contrary to Parker's denials that Stokes had mentioned various details to him, by our assumed preference for Parker's testimony over that of Stokes.

tank ramp for work on the tanks. He could reasonably infer that the accused had remained in the squad bay after the other occupants had left to go to the tank ramp for at least a final check of his attire and appearance before he departed for "Office Hours." There is evidence to indicate Parker independently knew that the accused had returned to the company area from the "Office Hours," but, in any event, Parker admitted he was informed by Stokes that the accused had returned to the company area sometime before the noon break in the training schedule, and that the accused had been given special permission by Stokes to leave the company area, after the noon formation, to go into town for the purpose of paying bills. Considering this evidence, Parker could reasonably conclude that the accused had probably returned to the squad bay to await the noon formation. Thus, Stokes' report as to the accused's presence in the squad bay accorded with Parker's own information as to the accused's probable presence in the squad bay sometime between the time Minderlen had left it and before Minderlen returned to discover the theft of his money.

In addition to the accused's probable presence in the squad bay, Parker had other information to consider. Stokes testified he had informed Parker, and Parker did not deny he was so informed, that the accused had been instructed not to leave the company area for town until he had attended the noon formation, but he had been absent from the formation. See United States v Sparks, supra, page 136. Whether regarded as a violation of a direct order or as a simple unauthorized absence, the accused's failure to appear could reasonably be considered by Parker as related to the theft. From the standpoint of ordinary human experience there is not, in the normal debtor-creditor relationship suggested by the accused's request to go to town to pay bills, such urgency to pay as to impel the debtor to commit a criminal offense in order to make payment a few hours earlier than he could have paid without committing the offense. Also, since the accused was a

212

member of the company, Parker could properly assume that he was aware of the policy of inspection of lockers and of the procedure that would result in a report by the owner of an unlocked locker of property taken from it.

Earlier, we noted that determination of the existence of probable cause to search depends upon an evaluation of known facts by a prudent person. United States v McFarland, supra. That standard of evaluation permits a degree of difference in judgment, especially between the judgment of an officer empowered to authorize the search and the judgment of the investigator acting without a warrant. "[I]n a doubtful or marginal case," said the Supreme Court of the United States, "a search under a warrant may be sustainable where without one it would fall." United States v Ventresca, 380 US 102, 106, 13 L Ed 2d 684, 85 S Ct 741 (1965). Here, Parker had probable cause to believe the accused had been present in the squad bay at a time when Minderlen's money was probably stolen and, from the other information before him, he could reasonably conclude that the accused wanted to leave the company area before discovery of the theft in order to get rid of money in his possession. Appellate defense counsel contend that other persons besides the accused could have been in the squad bay during the crucial period. Indeed, Parker admitted he knew that the squad bay doors were never locked. However, Parker had been informed of the whereabouts of persons not on the regular duty schedule, and he knew that the "rest of the company" was "on the tank ramp" working on the tanks. We assume, without deciding, that when many persons are present at the scene of a larceny, it is not reasonable to say that all of them are probably implicated in the theft. Parker's testimony establishes, however, that the probable number of persons in the squad bay was small and that the accused was one of that number. Presence at the scene of a crime may not by itself be sufficient to justify an inference of guilt beyond a reasonable doubt, but

presence can be weighed with other evidence to establish a probable implication. See United States v Romano, 382 US 136, 138, 15 L Ed 2d 210, 86 S Ct 279 (1965). Parker did not reach his decision to search solely on the accused's presence in the squad bay; he also considered the matters set out above, which tended to link the accused with the theft. Considering the totality of the information possessed by Parker, it supports, at least marginally, his determination that probable cause existed to search the accused and his locker.

In a second attack on the legality of the search, the accused contends the scope of execution exceeded that authorized by Parker, with the result that various items tending to establish guilt were illegally seized. Testifying as to the nature of the things for which he requested authority to search, Stokes said he asked Lieutenant Parker for authority to search for the missing money, and "anything that would relate" to the accused's and Dixon's finances, "as to how much money they had in relation to pay day, plus anything above that." The accused contends the authorization was more limited. Parker testified that "the only things" Stokes had "indicated to . . . [him] that he was looking for [were] $76.00 and a shoe string potato can, in which this money had been." Other testimony, however, reasonably indicates that the authorization to search extended to evidence as to the disposition of the money.

Parker did not authorize the search immediately upon Stokes' request. Instead, he asked for elaboration, and he "contemplated" the evidence "for quite some time." Part of the evidence included information to the effect that the accused had missed the noon formation, despite specific direction to be present, and that he had said he wanted to go to town to pay bills. Thus, Parker had to consider that if the accused was the

thief he could have disposed of all, or part, of the stolen money during his absence from the company area; and if he did so by paying bills, receipts for the payments would be important in determining the total amount of money he had had in his possession. Considering all the evidence on the point, we are satisfied the trial judge could reasonably conclude that Parker's authorization was as broad as Stokes represented it to be, and all the items taken from the accused and his locker were properly seizable.

At the end of the search, the accused admitted that he took Minderlen's money. On this appeal, he contends that the statement was the "product of an illegal search."[2] Since we have concluded that both the search and seizure were lawful, the assignment of error has no factual support. United States v Harman, 12 USCMA 180, 30 CMR 180 (1961).

Certain instructions provide the subject matter for the accused's final assignment of error. After instructing on the elements of the offense, the trial judge informed the court members as to the "permissive only and not mandatory" inference of guilt that might be drawn from the discovery of recently stolen property in the exclusive and unexplained possession of the accused. No objection was made by either counsel, but when the trial judge later returned to the inference in elaboration of an instruction on direct and circumstantial evidence, trial counsel asked leave to "interject." In material part, the exchange is as follows:

"MJ: . . . In this case, evidence has been introduced showing that property was wrongfully taken from a certain place at a certain time and under certain circumstances and was shortly thereafter found in the exclusive possession of the accused. Based upon this evidence you may justifiably

---

[2] At trial the accused also contended the statement was inadmissible as improperly induced. He testified he made the statement because it was "the only way . . . [he] knew to get him [Stokes] off . . . [his] back." The voluntariness of the statement was submitted to the court members by appropriate instructions.

infer that the accused wrongfully took the property from that place at that time and under those circumstances. The drawing of this inference is not mandatory but permissable [sic]. Its weight or effect, if any, is to be measured only in terms of its logical value and will depend upon all the circumstances attending the proved facts which give rise to the inference as well as all the other evidence in the case. In drawing and weighing any such inference, and in considering evidence introduced in rebuttal thereof, common sense and a general knowledge of human nature and the ordinary affairs of life should be applied.

"TC: If the counsel for the government may be permitted to interject here. I think the counsel for the defense will agree there is a statement which was made in the instructions which I don't think is particularly true in this case, in that the recently stolen property was actually found in the possession of the accused. I think counsel—

"MJ: Yes, right.

"TC: I think maybe perhaps the court may again be instructed—

"MJ: They will disregard that portion of my instruction pertaining to 'that shortly thereafter found in the exclusive possession of the accused.' Just that portion of the instruction which I will read again for clarification.

"In this case, evidence has been introduced showing that property was wrongfully taken from a certain place at a certain time and under certain circumstances. Based upon this evidence, you may justifiably infer that the accused wrongfully took the property from that place at that time and under those circumstances. The drawing of this inference is not mandatory but permissable [sic]. Its

weight or effect, if any, is to be measured only in terms of its logical value and will depend upon all the circumstances attending the proved facts which give rise to the inference as well as all the other evidence in the case. In drawing and weighing any such inference, and in considering evidence introduced in rebuttal thereof, common sense and a general knowledge of human nature and the ordinary affairs of life should be applied."

Appellate defense counsel contend the record demonstrates that the trial judge and counsel "all agreed that an instruction on inferences to be drawn from possession of recently stolen property was inappropriate," and they argue that the instructions allowed the court members, improperly, to conclude that the accused had wrongfully taken the property "solely on evidence that some property had turned up missing." Neither contention is tenable.

Lieutenant Stokes had testified that the can in which Minderlen had kept his money was not found in the accused's possession, but in a refuse container "just outside" the squad bay. Also, while there was significant correspondence between the denominations of bills taken from the accused and those stolen from Minderlen, the amount of cash found on the accused did not total $76.00.[3] These circumstances did not render inapposite the usual instruction, but rather, as trial counsel noted, they required that the instruction be modified to conform to the evidence in the case. As we observed in United States v Sparks, supra, it is "reasonable to infer from the fact of possession of part of stolen property that the possessor has [or had] the remainder." The trial judge should properly have modified the instructions to accord with the facts. It is arguable that elimination of the reference to "exclusive possession" by the accused covered the difference between possession of the

---

[3] Minderlen testified he had two $20s, two $10s, three $5s, and one $1; the accused had one $20, two $10s, one $5, and one $1. Receipts, money orders, and other transactions, added to the cash, "totaled just about the exact amount he had been paid the day before, and there . . . [was] $76.00 which he could not account for."

whole and possession of part, but court members are not skilled in the law and we doubt that they understood the significance of the change. Doubt, however, is not the equivalent of prejudice to the accused. All the instructions emphasized the court members' obligation to consider "all the circumstances attending the proved facts" in regard to the taking and to items discovered in the accused's possession. We agree with the United States Navy Court of Military Review that the instructions cannot fairly be construed as advising the court members "that the accused was guilty merely because" Minderlen's money was missing.

The decision of the Court of Military Review is affirmed.

Chief Judge DARDEN concurs.

DUNCAN, Judge (dissenting):

I am constrained to disagree with the conclusion reached by the majority. The theft occurred sometime between 8:00 and 11:00 or 11:30 a.m. At about 8:15 a.m., the accused was seen "by his rack," which was about five racks from the locker from which the money was taken. I am unable to find other significant *facts* indicative of the existence of probable cause for the granting of the authority to search.

I do not deny that there may be such a fact pattern when mere presence at the scene of a theft can be sufficient to give rise to probable cause for a search. However, where, as here, an unguarded open squad bay is the scene of a theft, which theft could have occurred within a span of three hours, I am unwilling to find presence of the accused at the scene reasonably productive of probable cause for the search.