UNITED STATES, Appellee

v

KENNETH H. SCHLOMANN, Specialist Five,
U. S. Army, Appellant

16 USCMA 414, 37 CMR 34

No. 19,389

December 9, 1966

 

*George W. Latimer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Calvin A. Behle, Esquire, Lieutenant Colonel Jacob Hagopian,* and *Captain John C. Holzer.*

*Captain Anthony L. Tersigni* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Specialist Schlomann was tried by a general court-martial on charges of premeditated murder, two specifications of felony murder, attempted murder, and attempted robbery, in violation of the Uniform Code of Military Justice, Articles 118 and 80, 10 USC §§ 918 and 880, respectively. Contrary to his plea of not guilty, he was convicted of unpremeditated murder, both specifications of felony murder, assault with a dangerous weapon, and attempted robbery. The sentence imposed upon this accused consisted of a dishonorable discharge, total forfeitures, confinement at hard labor for life, and reduction in grade. Throughout the intermediate appellate levels both the findings and sentence have remained unchanged.

This Court has granted review on the following issues:

### I

The law officer erred in failing to give accused's request for instructions.

### II

The board of review erred in its finding that the additional testimony submitted by the Menninger Clinic did not require a further hearing by a court-martial on the sanity of the accused at the time of the trial and at the time of the commission of the offenses.

### III

The law officer erred in admitting in evidence accused's pretrial statement, Exhibit No. 44.

### IV

The accused was denied his constitutional rights to the assistance of legal counsel prior to a hearing in the State of Alaska and particularly as that denial aided the District Attorney in obtaining a statement from accused which was later used to aid in his conviction.

These tragedies have their beginning on July 1, 1963. That afternoon the appellant and his wife visited a combination bar and restaurant located near Fort Wainwright, Alaska. When Mrs. Schlomann departed for work the appellant joined a dice game. Later, having left the game, he attempted to join in the conversation of others and found himself unwanted. Those present prevented more than a vocal exchange. Suffice it to say, he was invited to leave. During this period of time appellant probably consumed eight bottles of beer.

He next appeared at the Wainwright Noncommissioned Officers' Club for earlier in the afternoon he had tele-

phoned a Specialist Cook to arrange for a loan. Having collected $20.00, he left the club within the hour accompanied by this friend. It must be noted that during this period appellant had directed unwanted attentions toward a young lady then waiting in the NCO Club in the company of her mother. After some importuning, the girl danced with the appellant but when she later refused similar advances Specialist Schlomann carried out his warning that he would hit an occupant of a nearby table unless she acquiesced in his demands. Accused was described as drunk to the point of being belligerent, yet his speech was clear and his actions coordinated. As before, the accused was ejected.

At this time an officer acquaintance permitted the use of his car by Specialist Cook so that accused might be driven home. On the way the two stopped at a coffee shop and separated for a few moments. When each returned to the car, accused, carrying a bottle of liquor, declared his intention of returning home by taxi. He departed in this fashion while Cook drove the borrowed car back to the club.

At about 9:20 p.m., the appellant arrived at a local skating rink in the taxi operated by O. C. Howard. They stopped near a vehicle occupied by Mr. and Mrs. Gay and their son. Accused and Howard, both in the front seat, were arguing. Finally, appellant—handling a rifle—ordered the driver from the taxi. When the latter hesitated, the appellant threatened to kill Mrs. Gay and the boy.

Pointing the rifle out the taxi window, appellant began counting. As Mrs. Gay and the boy emerged from their car, the rifle was fired and while both were able to reach the sanctuary of the skating rink, she was found to have suffered wounds in both her back and hip. Howard, too, attempted to reach the rink but was downed by a single shot. Appellant then emerged from the cab, reloaded the weapon, walked toward the building entrance, and there shot Howard once again. He died of these wounds.

After firing a shot in the entrance

door, Specialist Schlomann entered the skating rink and proceeded to a nearby restroom where he temporarily ended the escape of a Private First Class Adams. As the accused entered this room, Adams wrestled with him for possession of the gun but when the former retained control, Adams shoved him away and made his escape through the front entrance of the building. Wounded at this time was Sergeant Miller, the rink manager, who had confronted the accused at the moment of Adams' departure.

Thereafter, the accused left the skating rink, drove away in the taxi, and then reappeared at a motel located about a half mile away. Here he first accosted and shot at a Mr. Smith and then forced the manager's son to accompany him to the motel office. There he found Mrs. Leonard, the manager, her husband, and Mr. and Mrs. Stockton, vacationers. He proceeded to shoot Mrs. Leonard in the hip while she was telephoning for police and next shot and killed her husband, even though this individual had complied with appellant's order to get him money. After telling the manager's son to prepare an automobile for his obvious getaway, appellant proceeded to shoot and kill Mr. Stockton saying, " 'old man, you are no good. I think I will just kill you.' "

Finally leaving this scene, the appellant moved to the various units of the motel. Firing through the front door lock of one such unit, he entered and was immediately confronted by other vacationers who had been concealed behind the door. They were able to wrestle the rifle away and subdue him. Alaska State Troopers then took charge and, with the aid of arriving military personnel, transported Schlomann to Fairbanks where he was confined.

With regard to the obvious question of mental responsibility, those who had been victimized by this appellant during this period of crisis considered him sane for he spoke clearly, walked normally, and knew precisely what he wanted and what he was doing. Criminal Investigations Detachment and

military police personnel who were at the motel after appellant's capture were of the same opinion. The struggling and vocal outbursts that followed appellant's capture were attributed to anger.

Some State troopers described appellant as under the influence of alcohol and of having a strange look about the eyes.

The testimony of medical experts was also in dispute. For example, the jail psychiatrist deemed the appellant sane, as did the examining psychiatrists from Letterman General Hospital. They described his condition as but a character disorder.

One local pediatrician, who had administered a sedative to the appellant on July 1st, gave a layman's opinion that accused was not mentally competent. A psychiatrist, in private practice, believed that he could not adhere to the right with respect to the specific acts charged. The family physician, reflecting on the past, believed that accused had been mentally ill since 1957. Numerous members of his family related a family history of epileptic seizures and one suicide. Collectively, they portrayed the accused as having an uncontrollable temper and as one who acted in an irrational manner.

## I

It is first contended that the law officer erred to the prejudice of the accused by failing to give the proposed requested defense instruction, "If the accused is acquitted by reason of insanity he will be presumed to be insane and may be confined in a hospital for the insane as long as the public safety and his welfare requires." Such an instruction is intended to neutralize the usual reluctance to find mental irresponsibility for violent crimes without some assurance that freedom from confinement would not result. It espouses a doctrine utilized in District of Columbia courts (Lyles v United States, 254 F2d 725 (CA DC Cir) (1957), certiorari denied, 356 US 961, 2 L ed 2d 1067, 78 S Ct 997; McDonald v United States, 312 F2d 847 (CA DC Cir) (1962)). At least one other jurisdiction is in accord. Bean v State, 81 Nev 25, 398 P2d 251 (1965).

The so-called *Lyles* instruction is founded upon the mandatory commitment requirement of the District of Columbia Code. Section 24–301 thereof provides that one *who asserts a defense of insanity,* and is acquitted on that ground, *must* be committed to a mental institution. Cf. Lynch v Overholser, 369 US 705, 8 L ed 2d 211, 82 S Ct 1063 (1962).

On the other hand, there are jurisdictions which have rejected the need for such instructions for it "tend[s] to draw the attention of the jury away from their chief function as sole judges of the facts, open[s] the door to compromise verdicts and to confuse the issue or issues to be decided." Pope v United States, 298 F2d 507, 508 (CA 5th Cir) (1962), certiorari denied, 381 US 941, 14 L ed 2d 704, 85 S Ct 1776; see also State v Garrett, 391 SW 2d 235 (Mo) (1965); State v Park, 159 Maine 328, 193 Atl 2d 1 (1963); State v Hood, 123 Vt 273, 187 Atl 2d 499 (1963).

The inapplicability of the rule to this case is readily apparent for in the military community there are no mandatory requirements regarding the incarceration of the criminally insane. United States v Smith, 5 USCMA 314, 17 CMR 314. To the contrary, pertinent Army regulations provide several possibilities. If "psychotic," one may be treated in a military facility for a limited time. AR 40–3, paragraph 60, July 31, 1963. Where prolonged care is required and if such illness is incurred in the line of duty, he may be administratively separated and treated in a Veterans' Administration hospital. AR 40–3, paragraph 70, supra. He may be placed in the care of next of kin or appropriate civilian authorities for disposition under applicable State laws. AR 40–3, paragraphs 68e and 70, supra. Finally, if suffering but a character disorder an administrative discharge may result. AR 40–3, paragraph 59, supra. Accordingly, the law officer's rejection of the re-

quested defense instruction on this matter was clearly appropriate.

## II

Believing that the accused had presented the board of review with evidence sufficient to make a determination in his favor, appellate defense here assert the board of review erred in concluding that additional post-trial evidence did not require further hearing by the court-martial on the matter of petitioner's sanity. This conclusion is buttressed by the argument that conditions under which accused was evaluated by the military were impossible for a fair determination of his mental responsibility. It is said that strained relations exist when one is interviewed believing that the interviewer is gathering evidence for criminal prosecution. Appellant was treated as a prisoner rather than a patient. Such hostility precluded the possibility of gathering all available evidence pertinent to the question of sanity. The Menninger clinical report and accompanying papers obtained subsequent to trial filled this void, according to the defense.

Appellate Government, on the other hand, say, in contradiction, that the conclusions drawn from the material in question are honed, not from new medical evidence, but from basically the same matter presented at trial and reviewed at the board of review level.

The board of review opinion clearly reflects that the post-trial psychiatric evaluations were not used ▇▇▇▇▇ ▇ in making a factual determination of the issue of mental responsibility. They were used, however, for the limited purpose of determining if the issue in question was raised, and whether, "under the prevailing circumstances, further inquiry by medical experts, or remand to the trial level for resolution of the issue, is required."

Indeed, it is proper to use such material for this limited purpose. United States v Thomas, 13 USCMA 163, 32 CMR 163; United States v Moore, 16 USCMA 332, 36 CMR 488. But, the review of the facts by the board of

review that is now demanded has in fact already been accomplished. The point of difficulty is thus not the failure of the board of review to examine the post-trial matter, for this has been done; rather, it is the conclusion drawn therefrom that distresses the appellant. The board of review may, of course, differ.

## III

We now turn to the issue of the admissibility of the statement taken from the petitioner. The record of trial shows that on the night of his confinement—at 11:00 p.m.—appellant was administered ninety milligrams of phenobarbital. The doctor intended to sedate yet keep him an alert patient. At 3:00 a.m. the next morning, a second dosage of ninety milligrams was administered. At 9:00 a.m., appellant was escorted to the Magistrate's Court for arraignment. When taken from his cell, he was described by some as dazed, dull, submissive, or "not real alert."

After arraignment, he was immediately taken to the district attorney's office located in the same building. The time was then 9:45 a.m. The district attorney began his interrogation of the accused by first advising him of his rights against self-incrimination. This included the advice that he had the right to be represented by counsel. It should be here noted that this same advice was given to the accused at the time of arraignment. This interrogator described the accused as appearing normal. He saw in the accused no effect of medication. This conclusion was supported by the testimony of the Acting Chief of Correctional Service for he, too, saw no residual effect of medication. Still another witness pictured the accused as alert, quiet, and polite.

One of the physicians testified that the phenobarbital shots administered should have had no effect on the appellant's overall ability to think, perceive, and understand at the time his pretrial statement was taken. However, a policeman present felt the accused "had probably" received medication of some kind.

**418**

The pretrial assertions of the accused were said to have been taken without use of force, threats or promises. They were reduced to print from notes taken by the district attorney during the question and answer session. Matters deemed extraneous were omitted. Nonetheless, he considered the accused's statement, as introduced into evidence, one hundred percent accurate. In fact, Schlomann read and then added to this finalized statement. Even so, one witness countered with the testimony that the accused was asked leading and suggesting questions and that only twenty percent of this statement was in his own words.

Combining the issues on this matter, the appellate defense counsel—relying upon Spano v New York, 360 US 315, 3 L ed 2d 1265, 79 S Ct 1202 (1959), and Massiah v United States, 377 US 201, 12 L ed 2d 246, 84 S Ct 1199 (1964)—contend that we should follow the lead of the Supreme Court and hold that once an accused has been arraigned he should not be interrogated by a district attorney in an extrajudicial proceeding.

Placed in proper perspective the question now posed is whether—in this case—accused's lack of counsel constituted a denial of "the assistance of counsel," in violation of the Sixth Amendment to the Constitution of the United States. In Federal cases the guarantee of this amendment directly applies. Johnson v Zerbst, 304 US 458, 82 L ed 1461, 58 S Ct 1019, 146 ALR 357 (1938). It is equally applicable, however, to State criminal processes. Gideon v Wainwright, 372 US 335, 9 L ed 2d 799, 83 S Ct 792, 93 ALR 2d 733 (1963). We are not here primarily concerned with the far different problem of self-incrimination, warning requirements of both Article 31, Uniform Code of Military Justice, 10 USC § 831, and of the Fifth Amendment to the Constitution; the latter being made applicable to State processes by Malloy v Hogan, 378 US 1, 12 L ed 2d 653, 84 S Ct 1489 (1964).

In pursuit of the issue so narrowed, we first turn to Spano v New York, supra. Spano surrendered to State authorities in the company of counsel who had advised him not to answer any questions. Nonetheless, a confession followed questioning by a series of interrogators over an eight-hour period. This statement was gained in the face of repeated refusals, on advice of counsel, to answer his interrogators. Moreover, his request to contact previously retained counsel was ignored. The confession was deemed inadmissible because it had been obtained from Spano who was then overborne by official pressures, fatigue, and sympathy falsely aroused.

In Massiah v United States, supra, that accused and another had been indicted for violating Federal narcotics laws. Massiah retained counsel, pleaded not guilty, and was released on bail. Thereafter, the co-accused agreed to work with Federal agents and thus permitted the installation of a radio transmitter in his car enabling Federal agents to intercept Massiah's conversations which were subsequently utilized against him at his trial, over defense objections.

In reversing *Massiah*, supra, the Supreme Court alluded to Spano v New York, supra, in these words:

". . . While the Court's opinion relied upon the totality of the circumstances under which the confession had been obtained, four concurring Justices pointed out that the Constitution required reversal of the conviction upon the sole and specific ground that the confession had been deliberately elicited by the police after the defendant had been indicted, and therefore at a time when he was clearly entitled to a lawyer's help. It was pointed out that under our system of justice the most elemental concepts of due process of law contemplate that an indictment be followed by a trial, 'in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law.' 360 US, at 327 (Stewart, J., concurring). It was said that a Constitution which guarantees a defendant the aid of counsel at such a trial could surely

**419**

vouchsafe no less to an indicted defendant under interrogation by the police in a completely extra-judicial proceeding. Anything less, it was said, might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' 360 US, at 326 (Douglas, J., concurring)." [Massiah v United States, supra, at page 249.]

The opinion then goes on to say that ever since the *Spano* decision

". . . New York courts have unequivocally followed this constitutional rule. 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and fundamental rights of persons charged with crime.' People v Waterman, 9 NY 2d 561, 565, 175 NE 2d 445, 448.

"This view no more than reflects a constitutional principle established as long ago as Powell v Alabama, 287 US 45, 77 L ed 158, 53 S Ct 55, 84 ALR 527, where the Court noted that '. . . during perhaps the most critical period of the proceedings . . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants . . . [are] as much entitled to such aid [of counsel] during that period as at the trial itself.' Id. at 57, 77 L ed 164. And since the Spano decision the same basic constitutional principle has been broadly reaffirmed by this Court. Hamilton v Alabama, 368 US 52, 7 L ed 2d 114, 82 S Ct 157; White v Maryland, 373 US 59, 10 L ed 2d 193, 83 S Ct 1050. See Gideon v Wainright, 372 US 335, 9 L ed 2d 799, 83 S Ct 792." [Massiah v United States, 377 US 201, at page 204.]

Reversal of *Massiah* followed the comment:

"All that we hold is that the de-

fendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." [Massiah v United States, 377 US 201, at page 207.]

Interpretations of *Massiah* are many. Some courts view the case as compelling the conclusion that post-indictment confessions are inadmissible solely for the reason that they are elicited in the absence of counsel. Representative is the case of Galarza Cruz v Delgado, 233 F Supp 944, 948 (D Puerto Rico) (1964). In that case —a habeas corpus proceeding by a prisoner in Puerto Rico—the judgment of conviction was vacated when it was shown that petitioner Galarza Cruz was confined pursuant to a warrant of arrest and thereafter taken before a district judge who extracted a confession without, at any time, advising him of his right to be assisted by counsel at that period in the proceeding. It was said:

"Respondent's claim that petitioner is not entitled to the protection that Massiah and Escobedo, supra, state a criminal defendant is entitled to, because he did not specifically request the assistance of counsel, is an artificial requirement with no constitutional strength whatsoever. The test must be a substantive one; whether or not the point of necessary protection for guidance by counsel has been reached. A defendant, as the petitioner here, who does not realize his rights under the law, and who therefore does not request counsel is the very defendant who most needs counsel."

In People v Bodie, 16 NY2d 275, 266 NYS2d 104 (1965), an incriminating statement given at an interrogation following the signing of a criminal information charging the defendant with selling narcotics was deemed admissible in evidence. It was held, in essence, that the right to counsel also imports the right to refuse counsel. Thus, the defendant could, and in fact

did, effectively waive his right to an attorney.

Expression of a totally opposite belief is found in Carson v Commonwealth, 382 SW2d 85 (Ky) (1964). It was there said that *Massiah* was distinguishable for it was a prosecution in the Federal court system where specific guarantee of the Sixth Amendment directly applies; that Federal agents knew Massiah had been indicted, had counsel, and was at liberty on bail; that Massiah was unaware he was being interrogated; and that the incriminating admissions were procured pursuant to a subterfuge conceived and executed by Federal agents.

The Kentucky court went on to say:

". . . In our judgment it is unrealistic to hold, as a rule of thumb, that any confession is absolutely void *solely* on the basis of absence of legal counsel when made. Neither do we feel that the rule should be different whether the confession occurred before or after indictment. For these reasons, we conclude that the statements appellant made to Mr. Young were properly admitted." [Carson v Commonwealth, supra, at page 93.]

More prevalent, however, appear to be those cases that do not treat *Massiah* as announcing a rule of law.

In United States v Guerra, 334 F 2d 138, 145 (CA 2d Cir) (1964), it was recognized that the Supreme Court in *Massiah* seemed wholehearted in its approval of the "constitutional rule" which had been followed without question by the New York State court. Nonetheless, in *Massiah*, care was taken "to emphasize that the 'use' to which the prior statement is put, must be determinative." As this tribunal read *Massiah*,

". . . it was the *use* of Massiah's *incriminating* statements, and the correlative prejudice to the defendant, which required reversal of the conviction thus obtained; the fact that Massiah had once been unlawfully questioned did not itself mean that he could never be subsequently tried. As we have already demonstrated, in the present case, the statement obtained was *not* incriminating and the innocent use to which it was put at trial was either equivalent to no use at all or actually benefited the defendant; under these circumstances, reversal seems wholly unwarranted."

In Turner v State, 384 SW2d 879 (Texas) (1964), appellant objected to the introduction in evidence of a confession made after indictment and in the absence of counsel. The court considered both *Spano* and *Massiah*, supra, and said, as to the first, that denial as to petitioner's request to consult with counsel was not the basis for the holding in that court's opinion. Regardless, there were factual differences which distinguished not only *Spano,* but also *Massiah.* On this basis their application was rejected.

In Johnson v United States, 344 F 2d 163 (CA DC Cir) (1964), the petitioner was interrogated by police some nineteen days after the continuance of the preliminary hearing to allow the defendant an opportunity to obtain and consult counsel. At the time of the interrogation that produced a confession, prior to the hearing, appellant was not represented by counsel but was in fact confined to the district jail. The confession obtained under such circumstances was deemed inadmissible as part of the Government's case in chief.

In Queen v United States, 335 F2d 297 (CA DC Cir) (1964), a self-incriminating statement was precluded from evidence when shown that it was elicited during the course of a secret interrogation, in the absence of counsel and during the continuance granted for the very purpose of enabling accused to obtain counsel. This frustrated the rights of the accused and for this reason, and notwithstanding the absence of an indictment, "the case clearly comes within the reasoning which led to the exclusion of the evidence in *Massiah* and *Escobedo.* And see Ricks v United States, 118 US App DC —, 334 F2d 964."

In Cooper v Commonwealth, 205 Va 883, 140 SE2d 688 (1965), the incriminating statements given by an accused during his interrogation at the

sheriff's office, after being indicted for rape, were deemed inadmissible. Alluding to both New York State cases and Spano v New York, supra, the Court concluded that on the facts presented it could not be denied that during this stage of the proceeding Cooper needed effective assistance of counsel. He was an individual of limited intellectual endowment who had counsel at the time of the interrogation, yet in the absence of that counsel made not so much as a request for aid. Counsel for Cooper was not even aware of the existence of a tape recording made by the purported victim which was played for the accused during this interrogation.

In so holding, the opinion clearly states that this conclusion is not to be taken as indicating that in all cases counsel must be present when a confession or incriminating statement is made by an accused so that it might be admissible in evidence against him in a criminal proceeding. Each case is to be judged on its own particular facts.

Circumstances surrounding the case of State v McLeod, 1 Ohio St 2d 60, 203 NE2d 349 (1964), are also worthy of mention. The defendant in that case was convicted of first degree murder. Used at trial was a voluntary oral confession given before counsel was procured or assigned and before arraignment. The Court of Appeals affirmed and thereafter the State Supreme Court dismissed an appeal for lack of a debatable constitutional question. Petition was filed for certiorari. The Supreme Court of the United States, 378 US 582, 12 L ed 2d 1037, 84 S Ct 1922, vacated the judgment and remanded the cause for consideration in the light of Massiah. Thereafter, the Massiah case was reviewed by the State tribunal and certain factual distinctions were pointed out. For example, it was emphasized that in both Massiah and Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), the incriminating statements were obtained while defendants were represented by counsel. In the former, trickery was used, while in the latter, the defendant's

request to consult with his counsel was denied. It was further contended that here the defendant had not been arraigned. Moreover, the "circumstances" under which his incriminating statements were made were wholly different from those in Massiah. Escobedo, too, possessed factors wholly absent in the instant case. In sum, the judgment was again affirmed. Petition for certiorari was again filed and the Supreme Court reversed the case, on Massiah, but, without opinion (381 US 356, 14 L ed 2d 682, 85 S Ct 1556 (1965)).

Somewhat similar is the case of People v Dorado, 42 West's Cal Rptr 169, 398 P2d 361, certiorari denied, 381 US 937, 14 L ed 2d 702, 85 S Ct 1765 (1965), for it considered the question of whether failure of accused to retain or request counsel justified the application of a rule of law different from that established in Escobedo. Having included Massiah in their consideration, that Court resolved the issue declaring:

"Summarizing the principal issue on the confession, we must decide this case in conformity with the decisions of the Supreme Court of the United States. That court having declared the content of a constitutional right, it is our function to enforce it in situations wherever it logically applies. To do otherwise would, in effect, be to distort the United States Constitution itself.

"We cannot say here that because defendant did not speak the words of a request for counsel we need not apply the United States Supreme Court decisions; the constitutional right does not arise from the request for counsel but from the advent of the accusatory stage itself. We cannot compress a constitutional right, expressed by the United States Supreme Court, into the shape of a frozen formalism." [People v Dorado, supra, at page 373.]

Of course, we do not test the effect of either Escobedo v Illinois, supra, or Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), upon the case at hand. The trial of Schlo-

mann began January 13, 1964, while *Escobedo* and *Miranda* were decided on June 22, 1964, and June 13, 1966, respectively. Both of those cases are to be applied prospectively from those dates (Johnson v New Jersey, 384 US 719, 16 L ed 2d 882, 86 S Ct 1772 (1966)).

Thus displayed is the gamut of interpretative possibilities. For our own part, we do not believe—in the absence of a positive pronouncement—that *Massiah* calls for an absolute rejection of the "totality of facts" doctrine. The direction we choose to take is that given expression in Jackson v United States, 337 F2d 136 (CA DC Cir) (1964), certiorari denied, 380 US 935, 13 L ed 2d 822, 85 S Ct 944 (1965). That defendant was tried for housebreaking and murder. Following an appearance before a commissioner he gave a confession, deemed admissible, though warned that his words could be used against him and advised that he could have an attorney if desired.

Replying to the declaration that the statement had been taken in violation of appellant's right to counsel under the Sixth Amendment, that court asserted:

"Thus we pass to the Sixth Amendment point which we had hoped might be—but which was not—resolved in *Massiah, supra* note 1. The question now is, must a voluntary confession, tested as above discussed, be excluded because given at a time when the accused was not represented by counsel?

"In Crooker v California no denial of *due process* occurred, the majority held, even though the record clearly disclosed that prior to his confession, the accused *asked for* and *was denied an opportunity to call a lawyer*, not yet retained.

"In Cicenia v Lagay, the accused before his arrest had retained counsel who repeatedly sought access to his client while the latter was being questioned by police. To hold that due process had been denied, said the majority, 'would mean that state police could not interrogate a suspect before giving him an opportunity to secure counsel. *Even in fed-*

*eral prosecutions this Court has refrained from laying down any such inflexible rule.*' (Emphasis added.)

"Both *Crooker* and *Cicenia* 'are not to be regarded as controlling' to the extent they may be inconsistent with Escobedo v Illinois. There the accused repeatedly insisted upon his right to advice from his own retained lawyer. The majority deemed of the essence that the suspect had 'requested and been denied an opportunity to consult with his lawyer * * * ' as appears from the holding as particularized. The Court concluded thus:

'We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and *its purpose is to elicit a confession*—our adversary system begins to operate, and, *under the circumstances here,* the accused must be permitted to consult with *his lawyer.*' (Emphasis added.)

"The dissenters saw in the decision 'another major step' toward the exclusion of 'all admissions obtained from an individual suspected of crime, whether involuntarily made or not.' Perhaps the Court will yet take that final 'step,' but the fact remains that it did not do so in *Escobedo,* a state case, nor did it do so in *Massiah, supra.* The latter has no application whatever to the circumstances in the instant case." [Jackson v United States, supra, at pages 139–140.]

The opinion thereupon concludes:

"Obviously neither *Escobedo* nor *Massiah* can be read as barring use of this appellant's confession. Many, learned in the law, deeply believe that no accused should be convicted out of his own mouth. But the Supreme Court has never announced any such proposition—not even where the accused had no attorney and had received no Rule 5 'judicial caution.' United States v Mitchell, 322 US 65, 70, 64 S Ct 896, 88 L Ed 1140 (1944). We said as much ourselves only a month ago in Ramey v United States, 118 US App

**423**

DC —, 336 F2d 743 (1964), cert. denied, 85 S Ct 79 (1964) and see United States v Carignan, 342 US 36, 72 S Ct 97, 96 L Ed 48 (1951) where Rule 5 advice had been imparted. If there were a rule that a confession may not be received *if made by an accused without counsel,* that would be the end of this case—and of scores like it.

"We conclude that no rule of law required the exclusion of this appellant's confession, voluntarily made, after he had been warned by the F.B.I., the police and the United States Commissioner acting pursuant to Rule 40(b). He had not requested that counsel be appointed; he had retained no lawyer; that one was not then appointed for him denied him no right; and as the law now stands, there is no automatic rule of exclusion which will bar use of such a confession by an accused who has no lawyer, under circumstances such as appear on the record before us." [Jackson v United States, supra, at pages 140–141.]

In short, we find no abuse of the Sixth Amendment in this case. Neither do we see a violation ■ of either the Fifth Amendment or Article 31, Uniform Code of Military Justice, 10 USC § 831. In the words of Jackson v United States, supra:

". . . The Supreme Court in Malloy v Hogan reiterated the long proclaimed standard to be applied 'wherever a question arises whether a confession is incompetent because not voluntary * * * .' The confession must be ' "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *" ' In other words the person must not have been *compelled* to incriminate himself.' (Emphasis added.) The confession here fully met that standard: it was voluntarily given; he was in no way *compelled*."

Here, as in *Jackson,* the appellant was properly warned of his right to counsel, in light of the law then applicable, and of the consequences that might flow from the giving of a statement. Furthermore, we ■ are satisfied there is evidence in this record from which the court-martial could find that appellant gave his pretrial statement unhindered by the effects of sedation; that, here, there was no demonstration of appellant's will being "overborne." (Townsend v Sain, 372 US 293, 9 L ed 2d 770, 83 S Ct 745 (1963); cf. United States v Decker, 16 USCMA 397, 37 CMR 17; United States v Goard, 13 USCMA 588, 33 CMR 120.) The effect of drugs upon the voluntariness of a confession depends upon the facts presented in the individual case (Townsend v Sain, supra; Annotation, 69 ALR 2d 384).

Accordingly, we make reference to but one other line of cases. Pretermitting the application of ■ *Miranda,* supra, members of the military are protected from unlawful interrogations under the terms of Article 31, Uniform Code of Military Justice, 10 USC § 831. Nevertheless, as early as United States v Grisham, 4 USCMA 694, 697, 16 CMR 268, we admonished:

". . . [I]f persons not subject to the Code—such as civilian law enforcement authorities—conduct an interrogation or request a statement in furtherance of any military investigation, or in any sense as an instrument of the military, then the duty arises to furnish sound advice concerning the provisions of Article 31. *Otherwise they are not required to do so—and their failure will not operate to deprive the court-martial of any statement they may secure."* [Emphasis supplied.]

In United States v Dial, 9 USCMA 700, 26 CMR 480, accused was apprehended and thereafter interrogated by Texas authorities without benefit of any prior warning regarding his rights against self-incrimination. The questioning by these officials concerned suspected acts by that individual contravening not only the Uniform Code of Military Justice but civilian law as

424

well. Regardless, this Court held the pretrial statement so taken admissible into evidence at Dial's court-martial. In doing so, we emphasized that part of United States v Grisham, supra, italicized above.

In United States v Holder, 10 USCMA 448, 28 CMR 14, we applied this same rule in construing admissible a statement taken from that defendant by an apprehending special agent of the Federal Bureau of Investigation.

As recently as United States v King, 14 USCMA 227, 230, 34 CMR 7, we reaffirmed the concept that "Article 31 . . . lays no requirement to warn an accused of his rights upon the shoulders of a civilian officer, unless his interrogation is in furtherance of a military investigation or he is acting in any sense as the instrument of the military." (Cf. United States v D'Arco, 16 USCMA 213, 36 CMR 369.)

Viewing the whole, we are convinced that Schlomann's pretrial statement was voluntary and thus admissible.

We recognize that, "[o]nce determined to be voluntary, a confession is deemed the highest order of proof." (United States v Odenweller, 13 USCMA 71, 32 CMR 71, citing United States v Monge, 1 USCMA 95, 2 CMR 1.) Although clearly admissible, it was used here only to augment eye-witness testimony. In this manner every offense of which accused was found guilty was clearly proven. Petitioner Schlomann, we are certain, was accorded those rights that were his due under the law. Fairly tried, he now stands convicted of those offenses hereinbefore set out. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.