UNITED STATES, Appellee

v

STUART G. GOLDMAN, Specialist Four,

U. S. Army, Appellant

18 USCMA 389, 40 CMR 101

No. 21,732

June 13, 1969

*Captain Howard L. Kaplus* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Major John Wall Hanft,* and *Captain Douglas J. Wold.*

*Captain Larry S. Seuferer* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick, Major R. Kevin McHugh,* and *Major Edwin P. Wasinger.*

DARDEN, Judge:

Appellate authorities have affirmed the accused's conviction of desertion and two counts of possessing counterfeit currency. The confinement portion of his sentence has been reduced by half, leaving him with a dishonorable discharge, total forfeitures, confinement at hard labor for five years, and reduction to the grade of Private E–1. Present issues concern both search and seizure and the right against self-incrimination.

The record of trial shows that military authorities had been engaged at some length on counterfeiting activities of American personnel in Saigon, Vietnam. As a result of their investigation it became known that the accused was using the name of Martinelli as an alias; that he was an American soldier subject to the Uniform Code of Military Justice; that he was in an absent-without-leave status; and that he lived at 333 Cong Ly, Saigon. Pictures had been taken of him and he had been pointed out by "informant-type personnel."

On March 17, 1968, authorities picked up a person named Papke as an absentee. He revealed that he had met Goldman through his associations with others named Ashlock, Velez, and Salzberg. According to Papke, Goldman admitted passing two hundred and forty thousand dollars worth of counterfeit money. Ashlock, when later taken into custody, informed authorities of a quantity of counterfeit currency and, he believed, Military Payment Certificates located at 333 Cong Ly, Saigon. Goldman, alias Louis R. Martinelli, was to meet him there in Ashlock's room. Further, Ashlock told authorities that a search of his own room, Room 5, would turn up counterfeit bills.

Military investigators, in company with a Vietnamese "judicial officer" and police, conducted a raid at the above address on April 7, 1968. A search of Room 5 turned up counterfeit currency in a closet and in a small case concealed in a suitcase placed under a bed. As the search began, accused walked in and identified himself as Martinelli. Recognized, he was placed under arrest and advised that he was suspected of being a deserter or absentee and of possessing counterfeit currency. An Article 31 warning followed. He was then placed against the wall and searched. At the same time, $5,000.00 in counterfeit United States currency was found in the pocket of a coat taken from a closet. Spontaneously, Goldman said, "'You'll find some more of the same in that suitcase,'" pointing to the partially concealed suitcase. The case, when opened, contained twenty-five additional fifty dollar counterfeit bills.

When other occupants of the house assured agents of accused's occupancy of Room 6, they searched that room. There, thirteen counterfeit Military Payment Certificates were found in a cigarette carton on a desk. Twenty-four fifty dollar bills were discovered in the pockets of shirts hanging in the wardrobe.

It appears that Goldman and a person named Ellert, alias Unser, lived in Room 6, and that Ashlock and Davis occupied Room 5. The suitcase appears to have been jointly owned by these four men. Certainly, Goldman knew its contents. The coat bearing the $5,000.00 belonged to Ashlock. The shirts carried no indicia of ownership.

Later, when taken to U. S. Army Headquarters, Military Police Station, the accused was informed, for the second time, of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. He then admitted being absent without leave from his unit; participating in black-market operations in and about Saigon; and passing counterfeit currency with Ellert, Davis, and others. Earlier, when taken into custody, the accused stated that he was happy to be apprehended. He had planned to give himself up

"because he was afraid he was going to be caught."

Appellate defense counsel respond to two possible grounds for justifying the search: one as incident to an arrest; the other, upon information providing probable cause, irrespective of the arrest. Of the former, appellate defense counsel contend that if there be grounds to arrest the accused as an absentee, his arrest in Room 5 was totally unrelated to the subsequent search of Room 6, making the latter illegal.

Similarly, counsel for the accused contend that probable cause was lacking for the search of Room 6 because Ashlock was not shown to be a reliable informant. His information as to the accused is said to amount to no more than mere suspicion. The search, they argue, is purely exploratory and therefore illegal.

In contrast, appellate counsel for the Government maintain that Room 6 was within the accused's immediate control and within the permissible limits of the search and consequently the search of it was incident to his arrest. They consider Rooms 5 and 6 as rooms of one apartment.

The theme central to our question is one of "probable cause." It exists "if the facts and circumstances justify a prudent man in concluding that an offense has been or is being committed. Henry v United States, 361 US 98, 4 L Ed 2d 134, 80 S Ct 168 (1959)." United States v Ness, 13 USCMA 18, 23, 32 CMR 18. "'Mere affirmance of belief or suspicion is not enough.'" Aguilar v Texas, 378 US 108, 112, 12 L Ed 2d 723, 84 S Ct 1509 (1964). The requirement may be satisfied, however, by hearsay information. United States v Price, 17 USCMA 566, 38 CMR 364; Spinelli v United States, 393 US 410, 21 L Ed 2d 637, 89 S Ct 584 (1969). Probable cause need not reflect direct personal observations of the declarant. Jones v United States, 362 US 257, 4 L Ed 2d 697, 80 S Ct 725 (1960). Without probable cause a search is invalid

even if it is incident to an arrest or if it is made with a warrant. United States v Ness, supra.

We find probable cause here. Aguilar v Texas, supra.

In the case at bar, authorities had the assistance of two informants. The "underlying circumstances" that gave validity, meaning, and reliability to their disclosures are clearly shown in the record.

Papke, claimed by the accused as a hometown friend, revealed to investigators that the accused, during their discussions, had admitted passing two hundred and forty thousand dollars in counterfeit currency. He also made clear the association between Ashlock, the accused Goldman, and others.

In like manner, Ashlock portrayed himself as one engaged in counterfeit activities and as a criminal associate of the accused. Both lived at the same address where, Ashlock disclosed, more counterfeit money was hidden. He took pains to describe specifically where the money could be found.

In short, the information supplied by both men passes *Aguilar* standards for reliability without need of independent corroboration. Those who authorized the search were justified in considering them more trustworthy than an unnamed informant. Indeed, both had been taken into custody for illegal activities. Where "the informer's hearsay comes from one of the actors in the crime in the nature of admission against interest, the affidavit giving this information should be held sufficient." Spinelli v United States, supra, 393 US, at page 425, Mr. Justice White's concurring opinion. Where the informant is a coactor, the same rule is even more appropriate. Cf. United States v Conlon, 14 USCMA 84, 33 CMR 296.

The information that justified the search also justified the arrest. We point also to the accused's absent-without-leave or desertion status as added authority.

"[A] search incident to an arrest can extend beyond the person of the one arrested to include 'the place where the arrest is made.' Agnello v United States, 269 US 20, 30, 70 L Ed 145, 46 S Ct 4." United States v Ross, 13 USCMA 432, 436, 32 CMR 432. This rule gives additional support for the search in this case.

Numbered rooms are usually descriptive of separate unrelated occupancies that can be likened to the separate rooms of a hotel or rooming house. Indeed, the rooms here were paid for separately. But even so, in this case, countering evidence suggests something more akin to a tenancy in common. The testimony is that the occupants of Rooms 5 and 6 lived, associated, and worked together in a common criminal endeavor. All seem to have had access to each room. The suitcase found under the bed in Room 5 was said to have had common ownership. Apparently all knew the location of other quantities of hidden counterfeit currency. The record also suggests that these men had access to a kitchen, an apartment-type accommodation. In short, the record of trial supports persuasively the argument of appellate Government counsel that Rooms 5 and 6 were but separate bedrooms of common quarters.

Finally, the *extent* of the search, which was restricted to evidence of counterfeiting, had the mark of "specificity." United States v Rabinowitz, 339 US 56, 94 L Ed 653, 70 S Ct 430 (1950). This aspect of the search, too, must be characterized as reasonable. United States v Ross, supra.

The second issue is whether the advice given the accused on his rights against self-incrimination satisfied the requirements of Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966).

When taken to Military Police headquarters after his arrest, the accused was informed by Agent Ogle that he was suspected of passing and possessing counterfeit currency and of desertion. The accused was also advised:

". . . Before I talked to him I said to him 'Before I ask you any questions you must understand your rights. You have the right to remain silent. Any statement you make may be used as evidence against you at a criminal trial. You have the right to consult with counsel and to have counsel present with you. You may retain counsel at your own expense or counsel will be appointed for you at no expense to you. If you are subject to the Uniform Code of Military Justice, appointed counsel may be military counsel of your own selection if he's reasonably available. Even if you consent to being questioned now without having counsel present, you may stop answering questions at any time. Alternately, you may request counsel at any time during questioning.' And then I asked him 'Do you want counsel?' He did not want counsel. And 'Do you consent to being questioned?' And he answered 'Yes.' "

Appellate defense counsel maintain that the warning given this accused both orally and as reflected in the preamble to the exhibit containing the accused's pretrial statement is deficient in two areas. The word "counsel" is used in both instances and they argue that in the armed forces it has a connotation different from its normal dictionary definition. The second deficiency they suggest is that both the oral and written advice inform the accused that anything said "may" be used against him instead of "can" or "will."

In United States v Keller, 17 USCMA 507, 38 CMR 305, this Court expressed the view that there is no presumption that an accused was properly warned of his rights to consult with counsel. The Government is bound to produce evidence of such a warning or suffer the consequence. Earlier, however, in United States v Mewborn, 17 USCMA 431, 38 CMR 229, the Court said with equal authority that such advice need not necessarily carry specific words

**393**

or phrases. On more than one occasion the Court has used "counsel" when concerned with warning advice. Cf. United States v Keller, supra. In Miranda v Arizona, supra, the words "counsel," "attorney," and "lawyer" appear to be used interchangeably.

At trial no objection was entered to the advice given the accused. When there is not the slightest ▊ suggestion that the accused misunderstood the advice, we cannot say that the warning given him in this case failed to meet *Miranda-Tempia*[1] standards. That in this situation an accused with sufficient sophistication to participate in a counterfeiting operation, to use an alias, and to fabricate identification could have thought counsel meant anything other than legal counsel is difficult for us to believe. There are other kinds of counsel, to be sure, but how this accused might have thought that in this context he was being offered nonlegal counsel escapes us. To avoid recurring controversies of this kind, however, it would be preferable for military interrogators to use the term "lawyer" or "attorney."

Neither do we perceive error flowing from the interrogator's choice of the word "may" in the ▊ warning given the accused, since the word conforms to the terminology of Article 31 to which it was related.

The final issue concerns the trial admissibility of a statement given by the accused in an exchange with the presiding officer during the Article 32 investigation.

This officer informed the trial court that when the initial hearing was convened he had apprised the accused of his rights, including an elaboration of Article 31, and had made accused aware of the purpose of the proceeding. Qualified defense counsel was present.

At the time of the statement in question, however, a recess had been called to await the arrival of a ▊ witness. Defense counsel left the room to make a telephone call; the investigating officer went to a screen door to smoke a cigarette; the accused, in turn, left his seat, walked over to the officer and asked what the battalion was doing. When told, Goldman recalled that he had been with the unit on November 7—at a time of "heavy contact"—and had been scared and afraid. In response to this statement, the officer said that many were afraid but did their job and then were rotated home. The accused replied, "'Yeah, well that's fine for other people, but I didn't want any more of that. That's why I left and I wasn't going to be involved in anything like that again.'" When trial counsel inquired if the accused had been encouraged to talk, the witness replied, "I didn't even know he had come up to me until he started talking."

Counsel for the defense—relying initially upon Spano v New York, 360 US 315, 3 L Ed 2d 1265, 79 S Ct 1202 (1959)—urge application of the New York rule that law enforcement officials are precluded from taking any statement—even if voluntary—from an accused after counsel has entered the case.[2] Under this concept, so goes the argument, the Article 32 officer should not have communicated with the accused in the absence of counsel. Goldman did not testify then or thereafter and it was not intended that the accused give a statement.

In United States v Schlomann, 16 USCMA 414, 37 CMR 34, this Court considered Spano v New York, supra, as well as the later case of Massiah v United States, 377 US 201, 12 L Ed 2d 246, 84 S Ct 1199 (1964). In *Schlomann* this Court rejected the contention that these cases make post-indict-

---

[1] Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966); United States v Tempia, 16 USCMA 629, 37 CMR 249.

[2] Also cited were: People v Meyer, 11 NY2d 162, 182 NE2d 103 (1962); People v Pizarro, 15 NY2d 803, 205 NE2d 695 (1965); People v Gunner, 15 NY2d 226, 205 NE2d 852 (1965).

ment confessions inadmissible solely because they occur in the absence of counsel. And, Miranda v Arizona, supra, 384 US, at page 478, makes it otherwise clear that "[v]olunteered statements of any kind are not barred by the Fifth Amendment."

Under the circumstances of this case we find no applicability for the holdings of the cases relied upon by appellate defense counsel. Further, in our view the conversation between the accused and the interrogating officer was that and no more. To call this exchange an interrogation rather than a voluntary conversation is to stretch the meaning of the word.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

I can only concur in the result because of the extensive dicta and many conclusions which serve as the basis for this opinion.

---

JULY 3, 1969

---

AMENDMENT TO CONCURRING IN RESULT OPINION PUBLISHED JUNE 13, 1969

---

FERGUSON, Judge:

Ten days after the publication of our opinion in this case (June 13, 1969), and two days prior to the issu-ance of this Court's mandate (June 25, 1969), the Supreme Court of the United States, in Chimel v California, 395 US —, 23 L Ed 2d 685, 89 S Ct — (No. 770, published June 23, 1969), decided that *in the absence of a search warrant*, a search conducted incidental to an arrest may not extend beyond the person of the individual and the area from within which he might obtain either a weapon or something that could be used as evidence against him. Since in United States v Goldman, the issue was a search incidental to his arrest, the search of room 6 was " 'unreasonable' under the Fourth . . . Amendment" to the Constitution. Chimel v California, supra, at page 16, slip opinion.

In addition, I believe that in light of the Supreme Court's opinion in O'Callahan v Parker, 395 US 258, 23 L Ed 2d 291, 89 S Ct 1683 (No. 646, published June 2, 1969), this accused should have been returned to the United States and tried in a Federal District Court for the two specifications under Article 134, alleging violation of section 472, Title 18, United States Code (possession of counterfeit military payment certificates and fifty-dollar bills, purporting to be obligations of the United States).

I believe that good cause exists for reconsideration of this Court's opinion and that counsel should be given the opportunity to present briefs and arguments on the applicability of these issues.