UNITED STATES, Appellee

v

LASCO SPARKS, Private,
U. S. Army, Appellant

21 USCMA 134, 44 CMR 188

No. 24,126

December 17, 1971

*Captain Terrence Ahern* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr., Captain Stewart Pettet Davis,* and *Captain Gary W. Allman.*

*Captain R. Craig Lawrence* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway,* and *Captain David E. Wilson.*

## Opinion of the Court

QUINN, Judge:

The accused contends that certain evidence obtained as a result of a search authorized by his company commander should not have been admitted against him. The contention has two aspects: (1) That the facts presented to the commanding officer were insufficient to constitute probable cause; and (2) that the informant who furnished the information was not shown to be reliable.

In previous cases we have emphasized that the burden of appellate review would be materially eased if the application for authority to search was in writing. See United States v Hartsook, 15 USCMA 291, 298, 35 CMR 263 (1965). Regrettably, the application in this case was not in writing; and it is apparent that all the material facts known to the agent were not presented to the company commander, Captain Marshall. We are constrained, therefore, to "look only to those facts known" to Captain Marshall. United States v Clifford, 19 USCMA 391, 393, 41 CMR 391 (1970).

Captain Marshall had some difficulty in separating the information he received from the agent from that he later acquired about the case. Resolving all doubtful instances in favor of the accused, it still clearly appears that he had probable cause to justify his authorization to search.

Marshall testified that on December 3 Agent Nevin informed him of a theft in which three items were taken "at the same time . . . [and] same place," a pair of shoes, a white trench coat, and a Polaroid camera. Nevin told him he had recovered the shoes, but not the other two items. The shoes had been recovered from a car belonging to Private Sloss who was known to Captain Marshall to be a "close" friend of the accused. Captain Marshall's testimony further indicates he was advised that the information as to the presence of the shoes in Sloss' car had come from Private Coleman, a person under investigation for other thefts. Coleman had told Nevin that he saw the accused put the shoes and a

135

yellow radio in Sloss' car. Nevin advised Captain Marshall that he "knew" that both the shoes and the radio "were stolen items." Captain Marshall was also advised that the shoes and radio were "identified" by their respective owners as property stolen from them. Finally, he was informed that the two thefts were "in the same vicinity." Captain Marshall reasoned that, since three articles were stolen "from the same location at the same time" and that the accused was seen in recent possession of one of the articles, "we would probably find either a pawn shop ticket or [the] items themselves that were stolen in the locker."

The law expressly recognizes, and common sense approves, the reasonableness of an inference that exclusive possession of recently stolen property identifies the possessor as the thief. United States v Ball, 8 USCMA 25, 23 CMR 249 (1957). It seems to us to be equally reasonable to infer from the fact of possession of part of stolen property that the possessor has the remainder. Concededly, the strength of the inference depends upon the nature of the property and the interval of time between theft and the discovery of possession. Here, the yellow radio had been stolen on November 24; the boots had been stolen on November 25. Captain Marshall did not specifically indicate whether he knew when these items had been stolen, but, in our opinion, Nevin's testimony supports the conclusion that he had advised Captain Marshall of at least the date of the theft of the boots. The property for which the search was to be made consisted of a camera and a trench coat. Nevin testified that he was involved in "numerous barracks thefts"; his experience indicated that a camera was "a pawnable item." Captain Marshall testified that Nevin told him the camera could have been pawned so that the accused might have a pawn ticket, instead of the camera, in his possession. While the record does not indicate Nevin informed Captain Marshall of the basis of his belief, the probability of pawning items of this kind is, we believe, so rooted in common experience that Captain Marshall could properly accept Nevin's statement without further evidence. Since the interval of time between the theft and possession of part of the stolen property was short, and the nature of the property was such as to make it reasonably probable that it, or evidence of it, was still in accused's possession, Captain Marshall's determination that a search was reasonable was, in our opinion, fully justified.

Left for consideration are the reliability of Coleman's report and the selection of the place to search. As to the former, we need only ask: What more evidence of the reliability of Coleman's information is required than the fact that the property he described was recovered by Agent Nevin and identified by its owner as property stolen from him? As to the latter, from the relative shortness of the period of time between the taking and the observation that the accused had possession of part of the property, it may reasonably be inferred that he still had possession of the remainder. Since the accused was not likely to be carrying the camera and the trench coat around with him at all times, the most logical place to search for them was among his personal possessions in his quarters. We conclude, therefore, that the search of the accused's room was founded upon probable cause established by reliable information.

Our conclusion as to the legality of the search disposes of the ancillary question of whether the search improperly tainted the accused's subsequent confession. Accordingly, we affirm the decision of the United States Army Court of Military Review.

Chief Judge DARDEN concurs.

FERGUSON, Senior Judge (dissenting):

I dissent.

In my opinion, there was neither probable cause to authorize a search of the accused's locker, nor to believe that the allegedly stolen items would be found there. Moreover, accused's con-

fession, following the search so closely in point of time, was obviously its fruit and should equally have been excluded from evidence. I base these conclusions on the unreliability of the informants from whom criminal investigators obtained the information presented to the accused's commanding officer and, as such requires a detailed review of the facts presented at the trial, I proceed to set them forth.

The accused was convicted of two specifications of larceny (a radio of a value of $5.00 and a wallet containing $40.00 in currency),[1] in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for ten months. The decision of the court-martial has remained unchanged through appellate review to this level. We granted review to consider the assertion of appellate defense counsel that the military judge erred in admitting into evidence the fruits of a search (Prosecution Exhibit 1) and the pretrial statement of the accused (Prosecution Exhibit 3) on the ground that the search was unlawful, due to a lack of probable cause, and the statement was the direct result of the unlawful action of the Government.

The basic question posed by this appeal has frequently occupied the attention of this Court. See generally, Tedrow, Digest, Annotated and Digested Opinions, U. S. Court of Military Appeals, Search and Seizure, pages 830–856. Although, in our decisions, we have unhesitatingly applied the stricture of the Fourth Amendment to the Constitution, regarding the necessity for probable cause to exist in order for a search to be valid, we have not yet placed upon the military the further requirement that a request for authorization to search be *supported by oath or affirmation.*

Our suggestion that such a procedure be adopted (United States v Hartsook, 15 USCMA 291, 298, 35 CMR 263 (1965)), in light of its obvious value both at trial and on appellate review, has been unavailing. As we said in Hartsook, at page 294:

"Where an affidavit, establishing the grounds for issuing a warrant, has been sworn to before the proper authority, and is available for review, no problem exists as to the basis for the latter's determination that probable cause existed. Jones v United States, 362 US 257, 4 L Ed 2d 697, 80 S Ct 725 (1960). But where, as in the military, authorization generally is granted on a mere verbal presentation, the issue must necessarily be determined through the taking of extensive testimony. This is often a difficult method of procedure for in most cases trial is held some period of time later and all concerned must rely on their memories to recall just what information was supplied and received. On occasion, the data and testimony available is not sufficient for a proper determination and on appeal we have had to return the case for a rehearing on this issue. United States v Davenport, . . . [14 USCMA 152, 33 CMR 364 (1963)]."

Having no warrant or affidavit available for perusal in this case, our determination of the issue of probable cause must turn on the data in the record of trial. In that regard, the rule of law was clearly set forth in United States v Clifford, 19 USCMA 391, 393, 41 CMR 391 (1970):

"In assessing the adequacy of the factual basis for the search authorization, an appellate court may look only to those facts known to Major Ragland [the officer who authorized the search] instead of to the 'total-

---

[1] The owner of the radio testified that it was taken from his room at a time when he was not there. He was acquainted with Sparks by sight and name but could not connect him with the theft. The owner of the wallet testified by deposition that his wallet disappeared after a night of heavy drinking. He was intoxicated and did not really know what happened. He was not asked whether he knew or could identify the accused.

ity of the information known to the agents.' United States v McFarland, 19 USCMA 356, 358, 41 CMR 356 (1970); Aguilar v Texas, . . . [378 US 108, 12 L Ed 2d 723, 84 S Ct 1509 (1964)]; Spinelli v United States, 393 US 410, 21 L Ed 2d 637, 89 S Ct 584 (1969)."

In the case at bar, Prosecution Exhibit 1, a wallet was seized from the accused's wall locker as a result of a search thereof authorized by Captain Marshall, the company commander. His testimony, detailing the basis for his authorization to search, comprises fifteen pages of a ninety-one page record. At the outset, Captain Marshall testified:

"A. I was approached by Mr. Nevin from the Criminal Investigation Division and he said that he had statements that—*showed me these statements* that Lasco Sparks had in his possession certain stolen items and at that time he stated that there were other certain items in question, a Polaroid camera and a white coat which had not been recovered but were stolen at the same time, at the same place as the other items. And he requested that he be permitted to search the accused's locker at that time.

"Q. Go ahead.
"A. And after considering the evidence that he presented to me, I gave him permission to search Sparks'—Sparks' locker at that time.

"Q. Did he tell you where these other items had been stolen from?
"A. At that time I believe he did, but I cannot recall at this time. I remember the items, but I don't remember exactly where they were stolen from.

"Q. Do you know exactly whether or not it was in the 3rd Squadron, 1st Cavalry?
"A. To my knowledge, it was not.

"Q. What did he tell you was a source of his information?
"A. It was statements from Private Coleman at that time.

"Q. Did he tell you that he had definite statements which implicated the accused in any larceny?
"A. Yes, he did. I can relate the statement that was presented to me at that time, that it was that Private Sparks had put a yellow radio in the car of Private Sloss, and this yellow radio was stolen property.

"Q. Why did he suspect Sparks of another larceny?
"A. Well, due to the fact that these other larcenies of a Polaroid camera and a white coat were in the same vicinity as the radio and the shoes.

"Q. Did you believe, based on what he had told you, that stolen items would be found in the accused's locker?
"A. Yes, I did.

"Q. Did you think or were you convinced that a crime had been committed at that time which implicated the accused?
"A. Yes. I felt that a crime had been committed and that the accused was involved in that crime by the evidence that he—I felt the evidence was strong enough to indicate that he was involved in that crime.

"Q. After getting all this information and determining that you believed the crime to have been committed and that you would find the stolen property in his locker, did you actually search the locker with Mr. Nevin or did you make an independent authorization to make the search?
"A. I made an independent authorization on the evidence. As I said, I considered all the evidence presented to me and then came to an impartial decision that I felt that the evidence presented to me was strong enough to indicate a possibility that the other items would be found in the possession of Lasco Sparks.

"TC. I have no further questions at this time, Your Honor." [Emphasis supplied.]

On cross-examination by defense

counsel, the following testimony is pertinent:

"Q. Captain Marshall, did Mr. Nevin tell you that Sloss and Coleman had both implicated Sparks?

"A. To my memory, Coleman was the one that implicated Sparks.

"Q. And did Mr. Nevin tell you that Mr. Coleman made a statement that Sparks had put a radio in Sloss' car?

"A. *I read the statement.* I believe that was the statement in fact, yes, sir.

.     .     .     .     .

"Q. But isn't it a fact that what happened is Mr. Nevin came to you and you just simply authorized the search based on what he told you. Isn't that correct?

"A. I based the search on the evidence that was presented before me which was that he had been seen with stolen property.

"Q. Now let me ask you this question: At any time, did Mr. Nevin or Coleman or Sloss indicate to you prior to the time you authorized the search that there was stolen property in Private Sparks' wall locker?

"A. I am not quite sure I understand the point of the question.

"Q. Did anyone before you authorized a search tell you that there was stolen property located in Private Sparks' wall locker?

"A. No. Nobody came to me and said they had seen stolen property in his locker." [Emphasis supplied.]

Upon examination by the military judge, Captain Marshall clarified his earlier testimony that he had read the statement by Coleman. He acknowledged his confusion because of the passage of time and his subsequent involvement in several cases, and stated that he had read the statement of Coleman implicating the accused *after* authorizing the search. His action on December 3d was based solely on the verbal presentation by investigator Nevin.[2]

Nevin testified that on December 3d he sought authority from the accused's company commander, Captain Marshall, to search the belongings of the accused. He had been involved in the investigation of numerous barracks thefts within the general area where Sparks was billeted and had received information that morning that Sparks had been observed placing some stolen property in another man's car. He had identified the victim of the stolen property and learned that other items had also been stolen from him. "One of the items was what we consider a pawnable item." Nevin was looking for a Polaroid camera, a three-quarters length off-white trench coat, or a pawn shop receipt for the camera. Nevin testified:

[2] The Article 32 investigation contains several statements by Coleman to investigator Nevin, the earliest of which is dated November 28, 1969. Therein, Coleman detailed his successful efforts to pawn a stolen television set at the request of Sloss. Sparks is not mentioned in that statement. In his statement of December 5th, *two days after the search of accused's locker,* Coleman disclosed additional information concerning the theft and pawning of a tape recorder and a camera. Several other servicemen, including Sloss, were named as being involved in these matters but not the accused. At the end of this statement, Coleman advised investigator Nevin that "Sloss told me last night [December 4, 1969] that SPARKS had stolen the Television set that I pawned." Not until the statement of December 8th does Coleman connect Sparks with the shoes found in Sloss' car. He did not mention the radio. Sloss, however, gave a statement to Nevin on December 3d, in which he asserted that he had observed Sparks put a yellow radio in his (Sloss') car about a week previously. That same night, according to Sloss, Coleman sold the radio to Specialist Four Martin for one dollar. Neither Coleman nor Sloss testified at the accused's trial on February 4, 1970. According to the pretrial advice they were both absent without leave as of January 21, 1970, and were not expected to be present as witnesses in Sparks' trial.

"A. I approached the command-ing officer and identified myself, told him that I had reason to believe that Sparks was implicated in a barracks theft, that I had an eye witness that had informed me that Sparks had placed an item of stolen property that I had recovered and identified as stolen property in a car. Al-though I had recovered one of the stolen items, there were two others still missing, a Polaroid camera and a trench coat that I was looking for; a trench coat or a Polaroid camera, or a pawn shop slip where one or the other items could have been pawned.

"My basis, of course, was the eye witness. Actually I had two people that told me he had placed the items in the car.

"Q. You believe that these thefts were connected together, the lar-cenies were connected, is this cor-rect?

"A. Yes, sir.

"Q. And exactly what did you tell Captain Marshall, again, that you were looking for or that you believed would be found in the accused's locker?

"A. The stolen Polaroid camera or a pawn shop slip or a trench coat. I was looking for any one of the three or all of them. The two items were stolen at the same time. The third item that I had recovered had been stolen.

"Q. And why did you tell him that you believed these items would be found in the accused's belongings?

"A. Because these other two men had identified Sparks as having pos-session of the stolen property.

"Q. Very well. Did you in fact conduct a search?

"A. I did, sir."

On cross-examination, Nevin ac-knowledged that he had recovered a pair of shoes and a radio on December 3d from Sloss' car, which was searched in connection with another investiga-tion. He was informed by Sloss that Sparks had placed these two items in the car. Since the shoes (but not the radio)[3] were part of the items stolen along with the trench coat and the Polaroid camera, Nevin "assumed" that Sparks "had stolen the other two items." No one told him that there was stolen property in Sparks' wall locker.

On examination by the military judge, Nevin testified that Coleman and Sloss were both subjects of another inves-tigation. When Sloss' car was searched "there were many, many items in Sloss' car, some of which he claimed and some of which he claimed no knowledge of and some of which he later told me other people had put in his car."

It is readily apparent that I have found it necessary to set forth in quite some detail the testimony of the wit-nesses in order to present as full and complete a picture as possible of the pertinent data concerning this issue, be-cause of the unavailability of some document, such as a written authoriza-tion to search, reflecting the basis upon which the authorization was granted. I join with the Chief Judge, as we did in *Hartsook,* supra, that while no such document is now required in military jurisprudence, its value both at trial and on appellate review is patently ob-vious. Those responsible for military justice and the conduct of courts-mar-tial should seriously consider the advis-ability of instituting such a procedure. Failure to do so may result in unneces-sary additional litigation and, perhaps, unavoidable reversal of otherwise valid convictions.

Now to the question posed by this ap-peal. Was the information presented to Captain Marshall sufficient to estab-

---

[3] Another radio, apparently the one accused was convicted of stealing, was recovered by Nevin in connection with another investigation prior to Decem-ber 3d. A statement by Specialist Four Martin, contained in the Article 32, dated December 5, 1969, reflects that Martin purchased *that* radio from Cole-man, not knowing it was stolen. Sparks is not mentioned in Martin's state-ment.

lish probable cause for a search of the wall locker of this accused?

Not every authorized search is a valid search. United States v Penman, 16 USCMA 67, 36 CMR 223 (1966); United States v Hartsook, supra; United States v Battista, 14 USCMA 70, 33 CMR 282 (1963); United States v Clifford, supra; United States v Elwood, 19 USCMA 376, 41 CMR 376 (1970); Nathanson v United States, 290 US 41, 78 L Ed 159, 54 S Ct 11 (1933), and cases collated therein at page 46. As this Court stated in United States v Ness, 13 USCMA 18, 22, 23, 32 CMR 18 (1962):

". . . The crucial element in a search question is the existence of probable cause. Without probable cause an arrest without a warrant is invalid and necessarily a search conducted as an incident to the arrest is also invalid. Similarly, a a search based on a warrant is invalid if probable cause does not appear in the facts presented to the officer issuing the warrant. See Jones v United States, 362 US 257, 4 L Ed 2d 697, 80 S Ct 725 (1960); Johnson v United States, 333 US 10, 92 L Ed 436, 68 S Ct 367 (1948); United States v Brown, 10 USCMA 482, 28 CMR 48 [1959].

"Probable cause to search exists if the facts and circumstances justify a prudent man in concluding that an offense has been or is being committed. Henry v United States, 361 US 98, 4 L Ed 2d 134, 80 S Ct 168 (1959)."

Cut to the bare essentials, it appears that Captian Marshall at most was aware of the following: Nevin was investigating a number of larcenies which had occurred in the barracks in the same general area where the accused was billeted; one of these larcenies involved a pair of shoes, a trench coat, and a Polaroid camera; the shoes were recovered on December 3d during the investigation of another larceny, from a car belonging to Sloss; a radio and many other items were also recovered at that time; Sloss informed Nevin that a different radio had been placed in his car by Sparks about a week previously, and that Coleman had sold that radio to Martin the same night; Coleman had orally informed Nevin that he had seen Sparks place a radio and a pair of shoes in Sloss' car; Coleman and Sloss were suspects in other larcenies. In addition, Captain Marshall testified that he was personally aware that Coleman, Sloss, and Sparks were acquaintances, possibly friends, and lived in the same troop area but not the same room. He had been their troop commander for less than one month. Despite the fact that Coleman and Sloss were themselves suspected thieves, he believed the information Nevin received to be reliable because he did not see why a man "just arbitrarily would implicate somebody else with no reason at all."

The question of the reliability of the hearsay information given to Niven was vigorously argued and explored at trial. While the facts in support of an application to search need not be predicated upon the personal knowledge of the applicant, when the application relies upon hearsay it must present *a substantial basis for crediting the hearsay* (United States v McFarland, 19 USCMA 356, 359, 41 CMR 356 (1970); United States v Davenport, 14 USCMA 152, 157, 33 CMR 364 (1963); Jones v United States, 362 US 257, 269, 4 L Ed 2d 697, 80 S Ct 725, 735 (1960)), or *a record of accurate and reliable information* (Draper v United States, 358 US 307, 313, 3 L Ed 2d 327, 79 S Ct 329 (1959)). In short, *a previously reliable informant*. Espinoza v United States, 278 F 2d 802 (CA 5th Cir) (1960).

Coleman and Sloss were suspected thieves. Prior to their coming to Nevin's attention they had not given *reliable* information. Stolen property was found in Sloss' automobile. While it was through their information that Nevin was able to recover the stolen radio, allegedly placed in Sloss' car by the accused, it was Coleman, not the accused, who had sold the radio to Martin. This is hard-

**141**

ly the required *substantial basis* for crediting the hearsay. The accused's involvement with the shoes, also found in Sloss' car, remains a mystery. Although the owner apparently identified them as having been stolen along with the trench coat and the Polaroid camera, the accused was never charged with their theft. In short, there is a complete lack of corroboration of the hearsay information supplied by Coleman and Sloss. Cf. United States v Penman, 16 USCMA 67, 36 CMR 223 (1966). The mere fact that they were disclosing their own involvement in other larcenies is not helpful. They were already suspected and their *cooperation,* as disclosed by their statements included in the Article 32 investigation in this case, revealed that they were both naming names and places at a furious rate. Interestingly enough, Coleman, in his statement of December 8th, advised Nevin, "I do not know who might have stolen the radio, camera, coat, and shoes."

For the reason stated above, I would hold that there was an insufficient basis for Captain Marshall to credit the hearsay information supplied to him by investigator Nevin. United States v Davenport, supra, and cases cited.

Central to the law of search and seizure is that probable cause must exist to believe, not only that a crime has been committed, but that the evidence sought to be seized is where the authorizing official thinks it is. Belief or suspicion is not enough. United States v Alston, 20 USCMA 581, 583, 44 CMR 11 (1971); United States v Dollison, 15 USCMA 595, 596, 36 CMR 93 (1966); United States v Clifford and United States v Elwood, both supra. As Mr. Justice McReynolds, speaking for a unanimous court in Nathanson v United States, supra, said at page 47:

"Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor *from facts and circumstances presented to him* under oath or affirmation. *Mere affirmation of belief or suspicion is not enough."* [Emphasis supplied.]

See United States v Penman, United States v Hartsook, and United States v Battista, all supra.

It is patently obvious that Captain Marshall received *no basis,* much less a *substantial* one, for crediting the belief that Sparks probably possessed the trench coat or the Polaroid camera, or even a pawn ticket, in his wall locker. Even were I to accept as credible the information supplied by Coleman and Sloss, that the accused had placed *a* stolen radio and the shoes taken at the time of the theft of the coat and the camera, in Sloss' car (cf. United States v Goldman, 18 USCMA 389, 40 CMR 101 (1969)), this information is still inadequate to connect the accused with possession of the stolen articles in his barracks room or with the pawning of any stolen article. United States v Clifford, supra. Absent a finding of probable cause, the search should be held to have been unlawfully authorized.

I need not dwell at length on the second issue for the accused's pretrial statement is clearly inadmissible in evidence as the fruit of the poison tree. After the wallet (Prosecution Exhibit 1) was found in the accused's locker, he was arrested the same day and incarcerated in a cell at the military police station. About two and one-half to three hours later, he was taken to Nevin's office and interrogated. The statement, Prosecution Exhibit 3, was obtained at that time.

As the statement followed so closely in time the illegal search, it would seem to be the direct result of exploitation by the Government of its illegal action and, hence, inadmissible. United States v Crow, 19 USCMA 384, 41 CMR 384 (1970); United States v Penman, supra; and Wong Sun v United States, 371 US 471, 9 L Ed 2d 441, 83 S Ct 407 (1963).

Turning to the rationale of the principal opinion, one must agree with

142

its observation that exclusive possession of recently stolen property permits the inference that the possessor is the thief. Here, however, the accused was not that person. Here, it was the informants who were caught with part of the stolen items, and the inference, if any, to be drawn is that they were the thieves, rather than the accused. Hence, it is fallacious to argue that it was reasonable for Captain Marshall to assume the balance of the items were in the accused's possession unless the information that he had placed them in Sloss' car was reliably founded. Spinelli v United States, 393 US 410, 21 L Ed 2d 637, 89 S Ct 584 (1969). The commanding officer must be informed of the circumstances which established that reliability. Aguilar v Texas, 378 US 108, 12 L Ed 2d 723, 84 S Ct 1509 (1964). The test is "[c]an it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass Aguilar's tests without independent corroboration?" Spinelli, supra, at page 415.

The majority opinion finds reliability of the informant Coleman in the fact that the property he described was recovered by Agent Nevin and identified by the owner as being stolen from him. In short, trustworthiness is established by finding that suspected thieves caught with the stolen goods are able to direct the police officer to their location and their owner identifies them. Such is said to permit the police safely thereafter to rely on the word of the thieves that the accused, rather than they, actually took the property and probably had the balance in his possession. I suggest that, rather than being supported by the reasonable inferences to be drawn from the possession of stolen property, such reasoning is clearly contrary thereto. United States v Ball, 8 USCMA 25, 23 CMR 249 (1957).

Moreover, Captain Marshall applied no such reasoning, nor did he base his authorization to search on the re-liability of Coleman and Sloss. He declared that Coleman "wouldn't have reason to implicate anybody unless it was true." Such bootstrap reasoning is hardly the corroboration of reliability demanded under Spinelli, supra, for it means any statement from any informer, caught, as here, red-handed, and desperately seeking to exculpate himself may be treated as having no reason to implicate someone else.

Such reasoning also offends against the ancient doctrine of treating the testimonial declarations of accomplices cautiously. Giving some credence to Coleman and Sloss, they were certainly accomplices in every sense of the word. United States v Scoles, 14 USCMA 14, 33 CMR 226 (1963). As such, their declarations should have been "closely scrutinized and received with great care and caution." Egan v United States, 287 Fed 958 (CA DC Cir) (1923). As was said in Phelps v United States, 252 F 2d 49 (CA 5th Cir) (1958), at page 52, "A skeptical approach to accomplice testimony is a mark of the fair administration of justice."

Captain Marshall took no such approach. As noted above, he simply believed no one would "have reason to implicate anybody unless it was true." Such perhaps was, understandably, the reaction of an untutored laymen called upon to perform a magistrate's function, but I cannot agree that it meets the test of being "trustworthy as a tip . . . without independent corroboration." United States v Spinelli, supra, at page 415.

In sum then, it is my firm conclusion that a finding of probable cause to search and to find allegedly stolen goods cannot be premised upon the verbal protestations of two admitted thieves, caught with stolen goods, for such cannot meet the standard of reliability laid down under the Fourth Amendement to the Constitution in the Supreme Court and this Court. Aguilar v Texas, Spinelli v United States, both supra; United States v McFarland, supra. As the search was, therefore, illegal, and the ac-

cused's confession a product thereof, I cannot agree with my brothers that this conviction should stand.

I would reverse the decision of the Court of Military Review and order a rehearing.