UNITED STATES, Appellee

v

PAUL L. WALTERS, Private First Class U. S. Army, Appellant

No. 27,000

December 14, 1973

*Arpiar G. Saunders,* Esquire, argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Major Franklin D. Arness,* and *Captain Peter J. Kenney.*

*Captain Robert C. Roth, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen, Major Thomas P. Burns, III,* and *Captain Merle F. Wilberding.*

OPINION OF THE COURT

QUINN, Judge:

Specialist David Standard died as a result of a bullet fired from a .25-caliber gun that passed through his heart and lungs. At his trial by general court-mar-

tial at Fort Bliss, Texas, for the robbery and murder of Standard, among other offenses, the accused moved to suppress certain evidence on the ground that the authorization to search therefor was lacking in probable cause. The motion was denied. We granted review to consider the correctness of the ruling.

Salmonson, a friend of Standard, testified that he and Standard had planned a motorcycle trip for the weekend of November 7-8, 1970, but the outing had been cancelled. As preparations were in progress in Standard's area for an inspection, and since he had "obtained the weekend off," Standard told Salmonson that he was going to sleep that night in his car, instead of in his room. About 7:30 the next morning, Standard was found dead on a parking lot in the 1000 area of Fort Bliss. About 10:00 a.m., a pathologist at the Army's William Beaumont General Hospital performed an autopsy on Standard's body. In his opinion, Standard died from internal bleeding, resulting from a gunshot which ruptured the heart. The pathologist placed the time of death between 3 to 8 hours before the autopsy, which would be between 2:00 a.m. and 7:00 a.m. An expended bullet was removed from the body, which a firearms expert later determined had been fired from a .25-caliber pistol.

Army Investigator Lambert was assigned to the case. He examined Standard's car, which was about 75 feet from Standard's body. The side window on the driver's side was "broken out." The nature of the break and glass in the interior of the car led Lambert to conclude that it had been broken "with a blunt instrument." A .25-caliber shell case was found on the back seat of the car. No weapon was present. On November 9, Standard's wallet was found on the top of Building 1011, which was about one-half block from where the body had been found, and the key to Standard's room was discovered in some bushes at the side of the building. Several days later, Standard's car keys were found at the same site.

Lambert and his partner canvassed "local establishments known to sell .25-caliber pistols." They compiled a list of about 150 persons who had purchased a pistol of that kind during the previous 6 months. By inference, it appears that they were investigating these purchases when they were informed that the accused had been apprehended by military policemen.

The accused was apprehended on the morning of December 3 by Fort Bliss military police in response to a telephone alert by the El Paso Police Department to apprehend a suspected armed robber, who was driving a Cadillac automobile, bearing a post decal, the last three digits of which were 956, and a North Carolina license number DJ4200. When apprehended in that car, the accused had five .25-caliber bullets in his possession. A box containing .25-caliber bullets was found in the glove compartment of his car.

On the same day, Lambert applied to Colonel Maline, the Deputy Commander of Fort Bliss, for authorization to search the accused's effects on post and his car. Lambert's sworn affidavit, which was submitted to Colonel Maline, is set out in the Appendix. The authorization was granted.

Searching the accused's wall locker, Lambert found an empty box for a Titan .25-caliber automatic pistol, bearing serial number B 83180. The serial number was on the list of gun purchases that Lambert and his partner had compiled. The weapon had been sold on October 31, 1970 by GI Joe's Pawn Shop to a person who had identified himself as "Howard Forest Johnson." A salesman at GI Joe's, who had seen the accused at the store on a previous occasion, identified him as the person who had represented himself to be Howard Forest Johnson. Subsequent investigation disclosed that the accused had pawned the gun at an El Paso pawn shop on November 29, and had reclaimed it on November 30. A handwriting expert compared the signature of Howard Forest Johnson on the Department of the Treasury firearms transaction record executed by him with the signature of the accused on documents taken from his official Army personnel file, and concluded that the signature "could have" been made by the same person.

Eventually, it was established that the gun had been found at the main access road to McGregor Range, Fort Bliss, on December 3, and that it had been transferred to various persons. When recovered, it was subjected to ballistics tests, which established a connection between it and the shell case found in Standard's car and the bullet removed from Standard's body. Other tests indicated that several cartridges found in the accused's possession at the time of his apprehension and some in the box taken from the glove compartment of his car bore markings corresponding to those made by the ejector of the pistol.

At an Article 39(a) session, at which the accused was represented by civilian counsel and appointed military counsel, the defense moved to suppress the evidence obtained from the accused and his car at the time of his apprehension by the military police. After hearing evidence, the trial judge denied the motion. That ruling was challenged in the accused's petition to this Court, but we denied review for lack of good cause. Also challenged at trial was the admissibility of the "evidence obtained as a result of a search of the accused's wall locker." On this appeal, the accused contends that Colonel Maline's authorization to search the wall locker was improper because the information furnished to him did not provide probable cause to believe that relevant evidence was in the locker, or among the accused's personal belongings. See United States v Sam, 22 USCMA 124, 46 CMR 124 (1973); United States v Lidle, 21 USCMA 455, 45 CMR 229 (1972). A detailed analysis of Lambert's affidavit leads government counsel to conclude that "overwhelming similarities" linked the crimes of December 2 and 3 and made it "most probable" that the accused was the culprit in each. We agree. Consequently, the remaining question is, as counsel contend, whether the information presented to Colonel Maline indicated that evidence relevant to the crimes "would *probably* be contained in appellant's wall locker." If there is a "substantial basis" in the affidavit to support Colonel Maline's determination that such probability existed, we will not overrule his judgment. Jones v United States, 362 US 257 (1960); United States v Penman, 16 USCMA 67, 36 CMR 223 (1966).

In two respects material to the issue before us, the December 2 robbery differed from the December 3 offenses. On December 2, the robber displayed a gun and had his face covered by a pink and blue scarf; on December 3, the culprit had no scarf, and did not, during the two attempted robberies, show a weapon, although his conduct was calculated to induce a belief that he had one. The immediate and logical question for Colonel Maline, therefore, was the probable location of these two items of evidence.

■ Lambert's affidavit indicated that the accused had been searched, and his car subjected to a "cursory search;" the enumeration of articles discovered in these searches clearly implied that neither the gun nor the scarf had been found. It was logical to suppose these articles had been hidden in the car, but had escaped detection because the search by the military police had been "cursory." However, it was also logical to reason that between the first robbery on the evening of December 2 and the attempted robberies on the morning of December 3, the accused had returned to his quarters, and had secreted among his effects at least the scarf and the $10 bill taken in the December 2 robbery, which was in a denomination that made it most likely to be identifiable if found in accused's possession with the $41 taken from the 7-11 store. The probability, in our opinion, was sufficient to justify a conclusion that these articles were in the accused's locker. See United States v Sparks, 21 USCMA 134, 44 CMR 188 (1971). Colonel Maline's authorization to search the locker was, therefore, lawful, and the seizure of the pistol box from the locker was proper.

■ A second aspect of the accused's challenge to the legality of Colonel Maline's authorization to search is directed to the search of his car. This search resulted in the seizure of a copy of a birth certificate in the name of Howard Foster Walters, a deceased brother of the accused. The date and place of birth on the certificate corresponded to the date and place of birth listed on the Depart-

ment of Treasury form executed by the Howard Forest Johnson who purchased the gun from GI Joe's Pawn Shop. Appellate defense counsel contend that, at trial, defense counsel "moved to suppress all evidence taken as a result of the search . . . [of accused's] vehicle," and that defense counsel argued that this search was "illegal and not supported by probable cause." However, government counsel argue that, at trial, neither civilian nor military defense counsel objected to the admission in evidence of the birth certificate, and the accused should not now be allowed to do so. See United States v Webb, 10 USCMA 422, 27 CMR 496 (1959); United States v Hooper, 9 USCMA 637, 26 CMR 417 (1958).

The record indicates specific objection to the search of the accused's car made when he was apprehended by the military police, but there is no such objection to the search conducted pursuant to Colonel Maline's authorization, which is the search in which the birth certificate was discovered. The only motion to suppress evidence obtained in searches predicated on that authorization was directed to "evidence obtained as a result of a search of the accused's wall locker;" and the only argument by defense counsel directed to evidence obtained in the searches subsequent to the accused's apprehension was that "the search of the wall locker and the evidence taken from it be suppressed." One defense statement was made in connection with the birth certificate; that occurred when the certificate was offered in evidence by trial counsel, and the trial judge asked whether there was "any objection." Defense counsel replied, "No objection." Consequently, the record supports government counsel's contention that no defense objection was interposed at trial, and established precedent would preclude consideration of the matter on this appeal. However, even if we gave overly-expansive effect to the general scope of defense counsel's evidentiary objections and construed them to include objection to the search that produced the birth certificate, information provided by the certificate was, in our opinion, harmless.

■ An unimpeached and unopposed witness directly and unqualifiedly identi-fied the accused as the Howard Forest Johnson who bought the .25-caliber gun that was used to kill Standard. Although the accused testified in his own defense, he did not deny the purchase. On direct examination, his only comment was: "I can't remember purchasing the pistol." Yet, he admitted he had a .25-caliber pistol in his possession which he acquired "around the first of November," and he admitted that he later pawned that pistol. As reflected on Treasury Department firearms transaction records that were properly admitted in evidence, the manufacturer and the model and serial number of the pistol pawned by the accused were the same as the manufacturer and the model and serial number of the pistol bought by Howard Forest Johnson. Thus, even if we assume that the certificate of birth should not have been admitted into evidence, the error presents no fair risk of prejudice to the accused and does not justify reversal of his conviction. United States v Simpson, 15 USCMA 18, 34 CMR 464 (1964).

The decision of the Army Court of Military Review is affirmed.

Chief Judge DARDEN concurs.

## APPENDIX

STATE OF TEXAS
COUNTY OF EL PASO   AFFIDAVIT

Before me, a Notary Public in and for El Paso County Texas, appeared William Lambert, Detachment A, 4th MP Gp (CI), Fort Bliss, Texas, deposes and under oath swears that the following is true to the best of his knowledge and belief:

On 3 December 1970, I received information from Detective Jerome Lattimer, Robbery Homicide Division, El Paso Police Department, that at about 2255 hours, 2 December 1970, the 7-11 store at 9830 Dyer was robbed by a Negro male wearing fatigues with a pink and blue scarf over his face. The Negro had a small calibre automatic pistol believed to be 25-calibre and obtained one ten dollar bill and approximately forty one dollar bills from the proprietor. This person was observed leaving the area in a late model blue or green automobile not further identified. The Negro is described as about 5'8" tall, weight roughly 175 pounds. Lattimer also advised that ap-

proximately 0845 hours on 3 December 1970, two tourists approaching El Paso in the vicinity of Newman, Texas, observed a late model green Cadillac beside the road with the hood up. They stopped to offer assistance. There was only one person in the vicinity of this vehicle. This was a Negro male, dressed in fatigues. When the tourists offered assistance, the Negro placed his hand in his pocket and presumably pointed a weapon at the tourists in an attempt to rob them, however they left the area prior to consummation of the robbery. At 0905 hours, a Negro male of similar description attempted to rob the Field Enco Service Station at Dyer and McCombs in El Paso, again by placing his hand in his pocket and indicating that he had a weapon pointed at the proprietor. Again, the robbery was not consummated and as the perpetrator left, personnel in the Enco station determined that the car he was driving was a 1966 green Cadillac with North Carolina license DJ4200. A short time later this vehicle was observed on the access road to McGregor Range and was stopped by the Military Police. The driver was PFC Paul Walters, 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, A Battery, Headquarters Command. Walters is a Negro male about 5'7" tall. A cursory search of his vehicle revealed a quantity of suspected marijuana and one box of 25-calibre ammunition in the glove compartment. A search of the person of PFC Walters revealed about five or six loose rounds of 25-calibre ammunition and forty-one one dollar bills.

I have been acquainted with Detective Lattimer approximately ten years and I have had frequent dealings with him during this period. I have found information received from him in the past to be reliable on nearly every occasion.

The foregoing information is based upon personal knowledge and information which has been obtained from Detective Lattimer, other CID investigators and Military Police both at McGregor Range and Fort Bliss, Texas.

/s/ William H. Lambert
    Criminal Investigator

Subscribed and sworn to before me this 3 day of December 1970

/s/ Eva R. Haggard, Notary Public, El Paso County, Texas

DUNCAN, Judge (concurring):

I believe that there was probable cause to search the appellant's wall locker for the scarf, but not for a weapon. The probability is that an article of clothing, a scarf, would be stored in an area where clothing is kept, a locker. Therefore, the discovery of the pistol box occurred during a lawful search. Otherwise, I agree with the majority opinion.