**UNITED STATES**

v.

**Nilger D. MOORE, II Seaman Apprentice, U. S. Coast Guard.**

**CGCMS 23530.**
**Docket No. 827.**

U. S. Coast Guard Court of
Military Review.

22 Jan. 1981.

Trial Counsel: LCDR Francis P. Hopkins, Jr., USCG.

Defense Counsel: LT Mark L. Goodwin, USCGR.

Appellate Defense Counsel: LT Judith M. Hammond, USCGR.

Appellate Government Counsel: LCDR Robert W. Ferguson, USCG.

OPINION

MORGAN, Chief Judge:

Seaman Apprentice Nilger D. Moore, II, USCG, was tried by a special court-martial military judge on 20, 21 and 22 February 1980. The accused pleaded guilty to and was convicted of two offenses of unauthorized absence in violation of Article 86, Uniform Code of Military Justice, 10 U.S.C. § 886 and an offense of impersonating a

petty officer in violation of Article 134, UCMJ, 10 U.S.C. § 934. The accused pleaded not guilty to one offense of wrongful appropriation and six larceny offenses in violation of Article 121, UCMJ, 10 U.S.C. § 921. He was acquitted of the wrongful appropriation offense and of one of the larcenies but was convicted of the other five larceny offenses. The military judge sentenced the accused to be confined at hard labor for four months, to forfeit $200.00 per month for four months, to be reduced to pay grade E–1 and to be discharged from the service with a bad conduct discharge. The convening authority approved the findings of guilty and the sentence. The officer exercising general court-martial jurisdiction set aside the convictions of one of the larceny offenses and of the impersonation charge. Upon reassessment, the sentence was approved but execution of the bad conduct discharge was suspended for the period of confinement and six months thereafter.

The validity of the accused's conviction of two of the larceny offenses is contingent upon the admissibility respectively, of an oral admission made by the accused to a Coast Guard Special Agent and of the fruits of a search of the accused's locker authorized by the commanding officer of his unit. Appellate defense counsel contends as was urged at trial that the accused's incriminating statement was obtained without proper warning of his rights as required by Article 31, 10 U.S.C.A. § 831, UCMJ and that the stolen items recovered from his locker were seized in the course of an illegal search.

On the evening of 17 December 1979 a wallet containing $177.00 belonging to a Seaman Apprentice Chase was stolen from Chase's pants hanging at the foot of his bunk while he slept. The currency consisted of two fifty dollar bills, three twenty dollar bills, one ten and seven ones. The accused was one of Chase's roommates. He came under suspicion since he was known to have been near the foot of Chase's bunk at the time of the theft. This suspicion intensified when the accused was observed paying for a $149.00 purchase from the exchange with two fifty dollar bills and three twenty dollar bills on the morning of 18 December 1979.

The accused was interviewed by Lieutenant Gill, the barracks officer, and by Special Agent Melia of Coast Guard Intelligence, respectively, on 18 and 19 December respecting the theft of Chase's wallet and the source of the money he had used to make the purchase at the exchange. The accused denied taking Chase's money and stated that his brother had sent him a $250.00 Wells Fargo money order from the West Coast.

Having learned through further investigation that the accused had no brother on the West Coast and that he could not have cashed a money order at a Baltimore Bank on the evening of 17 December 1979 as he had said he did, Special Agent Melia arranged to interview the accused again on 28 December 1979. Special Agent Melia met the accused in a Chief Bell's office in Fleet Hall at about 10:30. A Chief Warrant Officer Kosick was also present but did not participate in the interview. At the outset, Special Agent Melia advised the accused that he was suspected of stealing Chase's money and gave him a standard form containing the advice required by Article 31, UCMJ, including appropriate advice concerning the right to consult counsel and have counsel present during the interview. Special Agent Melia orally reiterated the various rights. The accused read the form, signified his understanding of each right enumerated by affixing his initials alongside and signed the form indicating his understanding of his rights. A second part of the form indicating his consent to be interviewed was not signed by the accused nor was a third part indicating a desire to make a written statement signed.

In reply to Special Agent Melia's questions the accused admitted that the money he spent in the exchange was Chase's. He then said that he didn't want to talk about it anymore and Special Agent Melia terminated the interview. Subsequently, Special Agent Melia asked the accused if he would give him a written statement and the accused declined to do so.

The appellant contends before us, as he did at trial, that his admission to using Chase's money was obtained in violation of Article 31 since he was not advised and did not understand that the term statement included an oral remark as well as a written statement.

The undisputed testimony of Special Agent Melia reveals that the accused was fully advised of his rights on the morning of 28 December 1979 essentially in the very words of Article 31. He was also properly advised of his right to consult with and have counsel present during the interview pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *U. S. v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). The accused read and signified his understanding of the advice respecting his various rights before he was interrogated by Special Agent Melia. The record also reveals that the accused is a person of ordinary competence.

A warning given in the language of Article 31 sufficiently apprises a suspect of his right not to make either oral, written or non-verbal statements. *U. S. v. O'Brien*, 3 U.S.C.M.A. 325, 12 C.M.R. 81 (1953); *U. S. v. Johnson*, 33 C.M.R. 547 (ABR 1963) petition for review by USCMA denied 33 C.M.R. 436. The question of whether the requisite advice was given and whether the accused understood his rights is for the trier of fact. In this case, the military judge heard the evidence and determined that the accused's oral admission to Special Agent Melia was voluntary. There is ample competent evidence in the record to support the military judge's determination. We are equally convinced beyond a reasonable doubt that the accused's incriminating oral statement was voluntarily and knowingly made. See *U.S. v. Hernandez*, 4 U.S.C.M.A. 465, 16 C.M.R. 39 (1954); *U. S. v. Heaney*, 9 U.S.C.M.A. 6, 25 C.M.R. 268 (1958); *U. S. v. O'Such*, 16 U.S.C.M.A. 537, 37 C.M.R. 157 (1967); *U. S. v. Bahnemann*, 3 C.M.R. 790 (AFBR 1960); *U. S. v. Meade*, 20 U.S.C.M.A. 510, 43 C.M.R. 350 (1971); *U. S. v. Molette*, 3 U.S.C.M.A. 674, 14 C.M.R. 92 (1954); *U. S. v. Graham*, 21 U.S.C.M.A. 589, 45 C.M.R. 263 (1972); *U. S. v. Girard*, 23 U.S.C.M.A. 263, 49 C.M.R. 438 (1975).

Seaman Rafael Figueroa was relieved of duty aboard the U.S. Coast Guard Cutter TAMAROA at the Coast Guard Yard, Baltimore between 0800 and 0830 the morning of 1 January 1980. Upon leaving the TAMAROA, Figueroa went to the accused's room in the barracks to obtain the keys and registration for his car which he had loaned to the accused the day before. The accused was asleep when Figueroa entered his room. On a desk in the accused's room Figueroa saw a key to his room at the Quality Inn Motel where he and other crew members of the TAMAROA were billeted while the TAMAROA was undergoing renovation at the Yard. Figueroa awakened the accused and asked him where he got the key to his room. The accused replied that he got the key from the front desk of the motel in order that he might borrow some books on emergency medical technology which they had talked about the night before. Figueroa told the accused that he might at least have asked for the key but the accused said he thought Figueroa wouldn't mind.

Figueroa obtained the keys, registration and insurance papers for his car and the extra motel key and returned to the Quality Inn. He took a shower and went to a drawer in his room to get his Schick Hair Dryer. The dryer was missing. Figueroa noticed that his English Leather Cologne was also missing. He thought that the accused might have borrowed those items also so he decided to go ask the accused about it. He looked for his green paramedic jacket and it was missing.

Figueroa returned to the Yard and reported the theft of the missing items to Chief Warrant Officer John Handel, the Officer of the Day. Figueroa gave CWO Handel a written statement concerning the missing items and amplified that orally by relating the circumstances surrounding his discovery that the accused had obtained a key to his hotel room and taken some books without his prior authorization or knowledge.

Commander William Zimmerman, Commanding Officer of Enlisted Personnel, U.S. Coast Guard Yard was at home on the holiday. CWO Handel contacted CDR Zimmerman by telephone, provided him the pertinent information he had received from Figueroa, and obtained authorization to search Seaman Apprentice Moore's locker. Figueroa's paramedic jacket, hair dryer and cologne were seized during CWO Handel's search of the accused's locker and were received in evidence at trial over defense objection. These items form the basis of one of the larceny charges of which Seaman Apprentice Moore stands convicted.

■ Trial defense counsel objected to the admission of the stolen items recovered from the accused's locker on the ground that Commander Zimmerman lacked probable cause to authorize the search of the locker. The military judge found otherwise. Before us appellate defense counsel has not conceded the existence of probable cause but has based her challenge to the validity of the search on the contention that Commander Zimmerman lacked the requisite magisterial impartiality required by *U. S. v. Ezell*, 6 M.J. 307 (C.M.A.1979) and related cases due to his knowledge of other actual or alleged misconduct by the accused.

Commander Zimmerman testified that prior to receiving CWO Handel's telephone call, he was personally acquainted with Seaman Apprentice Moore and was aware that Moore had been on unauthorized absence twice and was under investigation as a suspect in two thefts. As a result of this prior information, CWO Handel's statement that the accused was a suspect in the theft of Figueroa's property became in Commander Zimmerman's mind yet "another instance of similar type of occurrences".

In *U. S. v. Ezell, supra,* two investigators from the Criminal Investigation Division presented Ezell's Battalion Commander, Lieutenant Colonel Cross, evidence of probable cause to believe that Ezell had a quantity of heroin and a pistol in his barracks room. Colonel Cross authorized a search of Ezell's room which resulted in the seizure of a quantity of heroin and a non-government

pistol by CID agents. At Ezell's trial, defense counsel challenged the legality of the search of Ezell's room on the ground that Colonel Cross was biased against him.

Colonel Cross testified at trial that Ezell had been on the periphery, his name having come up a number of times during the year or the period Colonel Cross had been in command. He said that they never had any hard evidence that Ezell was involved in drug traffic so as to support prosecution but based on Ezell's character and his associations, Colonel Cross felt that he was probably selling heroin. Colonel Cross also testified that he regarded Ezell as a disciplinary problem, would prefer to have him out of his unit and, in fact, had recommended the administrative discharge of Ezell due to his unsuitability for further military service. On the other hand, Colonel Cross denied that he was "after Ezell".

The Court of Military Appeals rejected the contention that Colonel Cross was biased because he had been informed that Ezell had been involved in some illegal activities and would prefer not to have him in his unit. The Court found no showing that Colonel Cross was personally biased against Ezell or that he involved himself in the investigation or prosecutorial function. Instead, he performed the traditional command function of maintaining his troops in a state of readiness and remained severed and disengaged from activities of law enforcement and prosecution. Thus, the Court found that Colonel Cross was not disqualified to issue the authorization to search Ezell's barracks room.

■ In this case Commander Zimmerman was even more detached from the investigation than Colonel Cross was in the Ezell case. Commander Zimmerman was aware that Seaman Apprentice Moore had been on unauthorized absence twice and that he was suspected in two thefts which were under investigation or pending some resolution. However, there is no showing that he was personally biased against Moore or that he had initiated or involved himself in the investigation or prosecutorial process in Moore's case. The evidence of his involve-

ment reveals that he remained severed and disengaged from activities of law enforcement and performed only the traditional command function of maintaining the personnel of his command in a state of readiness to perform the mission required. Thus, Commander Zimmerman was not disqualified to authorize the search of Moore's locker. *U. S. v. Ezell, supra.* We are also convinced that the military judge's ruling that there was probable cause for Commander Zimmerman to authorize the search of Moore's locker is fully supported by the evidence before him. See *U. S. v. Sparks,* 21 U.S.C.M.A. 134, 44 C.M.R. 188 (1971); *U. S. v. Guerette,* 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975); *U. S. v. Barnard,* 23 U.S.C.M.A. 298, 49 C.M.R. 547 (1975); *U. S. v. Land,* 10 M.J. 103 (C.M.A.1980).

The findings of guilty and the sentence as approved and in part suspended on review below are affirmed.

Judges BEAVER and BRIDGMAN concur.

Judges HOLLAND and VERSAW did not participate in the decision in this case.